# Exhibit 4

1. DWF Defendants
2. G. Horn
3. First
4. No exhibit
5. 27 October 2023

**Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487 &
CL-2020-000369 (Consolidated)**

**In the High Court of Justice**
**Business and Property Courts of England & Wales**
**King's Bench Division**
**Commercial Court**

Between:

**SKATTEFORVALTNINGEN (the Danish Customs and Tax Administration)**

**Claimant**

**and**

**SOLO CAPITAL PARTNERS LLP (IN SPECIAL ADMINISTRATION) & OTHERS**

**Defendants**

_____

**FIRST WITNESS STATEMENT OF
GRAHAM MCKENZIE HORN**

_____

1. I am the 15th Defendant to claim number CL-2018-000404 and the 2nd Defendant to claim number CL-2018-000590.

2. This witness statement has been prepared based on a number of face-to-face discussions and online calls with various solicitors of the firm DWF Law LLP ("DWF") and my counsel team (together – my "**Legal Team**"). It has been prepared in particular based on evidence that I provided during in-person meetings with my Legal Team at DWF's offices in Dubai from 19-22 September 2023, and in subsequent interviews conducted by Microsoft Teams on 4 and 16 October 2023.

3. My Legal Team has assisted me as to the structure, layout and scope of this witness statement and has taken primary responsibility for drafting it. During the meetings I refer to above my Legal Team took me to a number of documents contained in the disclosure. These are listed in Schedule 1 appended to this statement, whilst I specifically refer to a small number of them during the course of this statement. I also list a series of documents that DWF provided to me in advance of the specific interviews referred to above, which

were in the form of various documents packs related to specific issues relevant to these proceedings.

4.    The events that are the subject of these proceedings took place a long time ago.  I have a good general recollection of those events, although I do not recall the precise dates that various relevant discussions took place.  Matters were often discussed over a series of conversations, and I do not recall the total number of conversations and when each conversation took place.  I refer below to such conversations in general terms.  Nor do I recall specific individual e-mails that I sent or were sent to me during the relevant period, and in this regard I am reliant on the documents that my Legal Team has shown to me.  Nothing in this witness statement should be understood as a waiver of legal professional privilege over any discussion or communication between me and my Legal Team.

5.    The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

**My Professional Background**

6.    In 1987 I graduated from the University of Edinburgh with First Class Honours in Biochemistry.  After spending another year at university researching protein structures, in August 1989 I joined Arthur Andersen in their London office, in the Tax Division.   In December 1989 I completed the first of my exams and in August 1992 I qualified as a Chartered Accountant.  In September 1994 I was promoted to a tax manager. My role at Arthur Andersen was as a tax accountant, assisting clients (mostly in the real estate business) with UK corporation tax compliance and tax-planning.

7.    In December 1996 I joined Morgan Stanley – being promoted to Vice President in December 1997 and an Executive Director in December 2001.  I was a member of the Tax Department in the business support unit.  This was an internal function supporting and controlling business units.  In this role I provided support to a number of business units across Morgan Stanley, including a large dividend arbitrage group. Morgan Stanley was involved in a wide number of dividend arbitrage strategies, in a number of

jurisdictions, both as proprietary trades and for clients. My role involved advising my colleagues at Morgan Stanley on whether proposed transactions should work from a tax perspective and on the availability of taxable profits in various entities, for example, for the purposes of sheltering profits with receipts of franked investment income. I was not ultimately responsible for deciding whether a particular strategy should go ahead, and the approval of Morgan Stanley's head of tax (based in New York) was needed before a strategy could proceed.

8.    In October 2002 I left Morgan Stanley and joined Merrill Lynch as a Director in their New Product Development Group in the European fixed income division. This was a front office role. At Merrill Lynch I was responsible for the design, marketing and execution of a number of successful fixed income transactions. In contrast with my role at Morgan Stanley, where I had some involvement with dividend arbitrage strategies, during this period at Merrill Lynch my role did not involve dividend arbitrage, as the fixed income division was separate from the equity division. However, I was close to (on a personal level) various members of Merrill Lynch's equity division, who were also involved in dividend arbitrage activity.

9.    I should point out that, although I had significant professional experience in tax matters, I did not work as a tax adviser to third parties either at Morgan Stanley or at Merrill Lynch. Nor did I have any legal qualification or training. For those reasons, throughout my career (including my time at Solo and subsequently) the tax arbitrage transactions I have been involved with have always been developed with the benefit of advice from expert, external tax advisors or lawyers.

**My Experience of Dividend Arbitrage**

10.    During the course of my employment with both Morgan Stanley and Merrill Lynch, both banks were actively involved in dividend arbitrage transactions, across a number of different jurisdictions and in a number of different ways. As above, this included being directly involved in such trading themselves (both on a proprietary basis and for clients) and offering lending, custody and stock sourcing services to clients for the purpose of such activity – for example many of their prime brokerage (custody) clients were obviously involved in dividend arbitrage activity. Both banks actively tried to identify

the best jurisdictions for such dividend trading.  This was true for many major international banks during this period, as well as numerous other participants in financial markets.

11.   Many trading strategies fall within dividend arbitrage activity.  At its heart is the simple suggestion that, because of applicable withholding taxes and accompanying applicable reliefs, where a company pays out a dividend, certain entities are entitled to receive a higher proportion of that dividend.  The advantaged entity is usually in a different jurisdiction to the company that pays the dividend, and the relief arises from either domestic legislation or a double tax treaty between the country where the entity is incorporated and the country of the company paying out the dividend.  Accordingly, a series of transactions would be entered into so that the relevant entity (i) was entitled to receive the dividend when it was paid out; and (ii) was, to the extent possible, protected against movement in the share price and other risks.

12.   The second of these factors was designed to ensure that a profit would be generated from the transactions.  At its simplest this could be a trade to acquire the relevant securities, hedged with a future to fix the price at which the shares would be sold, so ensuring (once the additional entitlement from the dividend is taken into account) a profit.  However, in practice, the structuring was often more complex than this, and usually involved a series of trades with the intention of reducing risk as much as possible and ensuring a fixed return from the trading. For instance, the trading might involve a stock loan to reduce leverage requirements; or it might involve the participants entering into futures or forwards to hedge against the risk of movements in the stock price. I would describe the various transactions put in place to make the relevant entity (a) entitled to receive the dividend; and (b) reduce risk and ensure a fixed return, as the "IP" or the "technology" of the trading.  This IP/technology can be very valuable, and firms would generally be keen to protect it.

13.   In my experience, dividend arbitrage has always involved dematerialised securities – i.e., where paper-form shares have become defunct and the securities are simply book entries recorded in accounts maintained by a central securities depository (a **"CSD"** – in the case of Denmark, VP Securities) or at a custodian further up the chain.

14. The vast majority of investors will not maintain an account at a CSD, but will instead maintain accounts at financial institutions that provide clearing, settlement, custody and safekeeping services.  The provision of such services is usually a regulated activity (it is in the United Kingdom).  These institutions are often referred to as "custodians" or "prime brokers". Although the terms are often used interchangeably, they are not synonymous: a custodian's role will typically be limited to the holding (custody) and clearing of assets for its clients; a prime broker will custody assets but will also provide other services such as the provision of research or leverage to support its clients' activities. Some custodians (typically larger providers) will maintain accounts at a CSD, but others will maintain an account at a sub-custodian.  This arrangement is often referred to as "a chain of custody".

15. Where a company pays a dividend, it will, in the first instance, pay the relevant monies to the CSD. This payment is net of any sums to be withheld in tax, which will be paid directly to the tax authority; the effect of this withholding at the issuer level is that individual shareholders never make tax payments on their receipts of dividends.  The CSD will then pay the monies representing the dividend through the chain of custody, theoretically finally reaching investors in accounts held by them at their own custodians. This will be either to a segregated account – a separate, clearly identified account for each client, or an omnibus account, - a single client account reflecting balances held for all clients.  For omnibus accounts, the custodian will maintain internal account records for each of its clients, but these balances are commingled and it will only be the aggregate (or net) position reflected in the omnibus account that will be recorded by the sub-custodian.

16. The result of operating an omnibus account is that trading may lead to changes in an individual client's interests, but where there is no change in the overall balance of the custodian's omnibus account, no change will be reported to the sub-custodian.  As the simplest of examples – if custodian client A sells 5 shares in a company, but client B acquires 5 shares in the same company, then there will be no change in the custodian's omnibus account as to the volume of shares held in that company, and accordingly no change will need to be reported at the sub-custodian.

17. It is a standard market convention that where a party acquires shares prior to an announced "ex-date" (and has not sold them before the close of business on the ex-date)

it has the right to any dividend payments announced by the issuer, whether or not that purchase has settled. In my experience, the process by which the right is satisfied can vary, but the guiding point is that the purchaser (who has paid a cum-dividend price for the shares) has the right to receive the dividend from its custodian. If the share purchase remains unsettled over the dividend record date, the custodian will ultimately recover the amounts from the seller of the shares, or an intermediary in the chain of custody. This includes situations where the investor may have acquired the shares on a short basis – e.g., where, as is expressly permitted, at the time of the sale, the seller did not own the shares that it sold and so would not be entitled to a dividend itself. In my experience, the payment received by the purchaser in that situation was known as, and treated as, a dividend. It is sometimes referred to as a compensation payment, and in this witness statement I will refer to it as a "**Market Claim**".

18.  A Market Claim is not the same as a 'manufactured dividend', which arises under a stock loan or repo contract where the stock loan or repo crosses a dividend date, such that a contractual payment has to be made to the agreement counterparty under the terms of the contract. There are some similarities between a Market Claim and a manufactured dividend, in that both are payments of the amount of the net dividend. But a crucial difference is that for a manufactured dividend, the recipient's entitlement arises solely from the terms of the underlying contract (whether a stock loan, repo or similar) whereas for a Market Claim, the recipient's entitlement arises because, as a matter of well-established market practice, the recipient is considered to be the owner of the purchased volume of shares and therefore has an entitlement to the corresponding dividend amount (with the monies to be collected by the recipient's custodian from the seller or the seller's custodian by way of standardised procedures). In my experience, in respect of manufactured dividends, though they would (of course) be included in the custody statements, custodians would not typically provide clients with an immediate notification of the receipt of such a payment.

19.  Also in my experience, where a dividend event has happened, it will not always be possible to trace monies eventually received by an investor at their custodian through the chain of custody up to the CSD. This is because, at every level "up" the chain of custody, it may be impossible to determine whether the payment received by each custodian and transmitted on to the next custodian in the chain is made up of monies that originate

directly from the company, or whether those monies also include Market Claims arising from the circumstances described above. This is so regardless of whether the transaction giving rise to the payment involves short-selling or net settlement within the custodian's omnibus account. The activity of other market participants may still make tracing impossible.

20.  In practice, prior to these proceedings, I had no experience of any market participants seeking to investigate whether the payment they had received could be traced back to the CSD/the company paying the dividend nor was I aware of any example where there had been a reason necessitating such an investigation, absent a jurisdiction which required traceability to a CSD per its explicit tax law.  For example, one such jurisdiction was Japan. I recall our initial investigations concluded that WHT reclaims would only be valid if the payment received by the investor could be traced (via a series of back-to-back payments) to an amount paid to a CSD by the underlying company. This requirement precluded the type of dividend arbitrage ultimately used for the Danish trading, and so it was not pursued. Otherwise, in my experience working in the financial services industry, I was not aware of any distinction between a Market Claim and monies paid by a company to a CSD which works it ways up the chain of custody to the custodian where the ultimate client holds their account.  In this statement, save where I have expressly stated to the contrary, I do not distinguish between a Market Claim and monies paid by a company to the CSD.  In fact, as I describe below, in my experience, as far as tax issues are concerned, the actual receipt of the "dividend" by the investor can be irrelevant, with many jurisdictions working on an accruals basis and the only relevant issue being the date on which they entered into an agreement to acquire the shares.

21.  I have been shown several contemporaneous documents which support my understanding (now, and at the time I saw the documents) of the terms Market Claim and manufactured dividend:

21.1.  An email from Thomas Wiesenbart, who was a senior tax partner at Freshfields Bruckhaus Deringer ("**Freshfields**"), to Darren Thorpe, who was also involved with dividend arbitrage trading (although not at Solo) (document ID SKEL00157796).  The email was forwarded to me on 10 November 2011. The email relates to an attempt by the German authorities to restrict cum-ex trading

in Germany (which I believe did not succeed, although I was not personally involved in German dividend arbitrage trading). In paragraphs 1 to 10 of the email, Mr Wiesenbart refers repeatedly to "*dividends/market claims*" as being indistinguishable for German withholding tax purposes, prior to the proposed change in the withholding tax regime (which was also my own understanding). In the second part of the email, Mr Wiesenbart gives his view on the effects of that change, which meant that a "*market claim*" and a "*real dividend*" would start to be treated differently. That also accorded with my understanding that, absent some specific feature of a tax regime that distinguishes between them, a Market Claim would be treated in the same way as a dividend traceable to the CSD.

21.2.  An email exchange between Raj Shah and me on 3 September 2012 (document ID SKEL00956357). Raj and I are discussing why Solo did not get involved with dividend arbitrage trading in the Netherlands. Raj suggests this was because "*Compensation payment not treated as a dividend?*".  Although I replied that that suggestion "*Doesn't ring a bell*", it did accord with my understanding that, in many jurisdictions, Market Claims were treated as dividends, and that Solo would not be interested in dividend arbitrage trading in jurisdictions where that was not the case.

{MTKC3/408}

21.3.  An email exchange between Raj and me on 22 October 2012 (document ID SKEL00181849). Raj and I are discussing the accounts of Cayman entities involved in dividend arbitrage trading in Luxembourg. In that jurisdiction, unusually, dividends arising from a stock loan over a record date (i.e., manufactured dividends) were treated as a dividend for withholding tax purposes. In response to a point Raj makes about withholding tax ("*WHT*"), I clarify that: "*Manufactured dividend payments are not treated like real dividend payments whereas manufactured dividend receipts in the Luxcos were treated like real dividend receipts*". This is consistent with an earlier email exchange on the Luxembourg trading between Raj and Anupe Dhorajiwala (into which I was copied) dated 4 June 2012 (document ID SKEL00097907). This exchange concerns the language used in custody statements, and Raj explains "*The term*

{MTKC3/868}

{MTKC2/662}

8

> *'Manufactured Dividend' is relevant to the Luxembourg shares traded (ArcelorMittal and SES Global) otherwise all should read 'Dividend'".*

22.    Dividend arbitrage can be broken down into two forms of trading:

    22.1.    *A Cum-Cum transaction*    -    this sort of trade involves the relevant entity acquiring the shares with a dividend entitlement and the trade settling prior to the announced record date and selling the shares after that date.

    22.2.    *A Cum-Ex transaction*    -    this sort of trade involves the relevant entity acquiring the relevant shares with dividend entitlement before the ex-date, but with the trade not settling until after the record date.  As per paragraph 17 above, in all trading that I have been involved with, the purpose of this is that the entity acquiring the shares would become entitled to a Market Claim.

23.    As per paragraph 12 above, both of these forms of trades will require IP or technology – as in a series of trades to ensure that (i) the relevant entity has acquired the shares/is entitled to receive the dividend at the relevant time; and (ii) to reduce risk and seek to fix the profit that the trading will generate.

24.    Morgan Stanley's and Merrill Lynch's involvement in dividend arbitrage activity was not a secret.  Many high-profile banks were similarly involved in the same trading.  This involved both cum-cum type transactions, and subsequently cum-ex transactions.  I can recall Barclays being involved in dividend arbitrage, making its very substantial institutional shareholdings available to market participants who, as Barclays would have known, were involved in cum-ex trading.  These sorts of trades were openly discussed across Morgan Stanley and Merrill Lynch, and were explored in numerous jurisdictions: it would probably be easier to name countries where you couldn't execute cum-cum trading rather those where you could; and, although cum-ex trading was not as prevalent as cum-cum, it was still common.  There were always discussions as to the appropriate vehicles to use for such trading, with banks often incorporating their own entities in appropriate jurisdictions specifically to be used for this purpose.  Pension funds were often mentioned as being a useful vehicle in the market which usually received positive tax treatment.

25. There were also many law firms who were openly promoting such trading and providing advice relating to the same. For example, whilst at Merrill Lynch I can recall seeing an advice by Axel Haelterman, from the Belgian office of Freshfields, suggesting that cum-ex trading was possible in Belgium. I do not recall the detail of that advice other than to suggest that cum-ex type transactions relating to shares in Belgian listed companies led to valid applications for withholding tax reclaims. As detailed below, whilst at Solo we subsequently obtained advice from Mr Haelterman and also introduced him to Argre (the organisation which introduced the US Pension Funds that were Solo's clients).

26. I am fully aware that cum-ex trading is controversial and carries with it a reputational risk for those involved in it. Cum-ex trading reduces the amount of tax that is received by the state where the trading is taking place. However, during the course of my experience at Merrill Lynch and Morgan Stanley, such trading was felt to be acceptable by both those banks, and a very large number of other institutional/mainstream banks. I should add that some of this trading, for instance Austrian trading involving Macquarie Bank as prime broker in 2010-2011 (but which did not involve Solo), also used the net settlement of trades to zero in the custodian's omnibus account as a mechanism to obviate the need for external funding – a mechanism which Solo subsequently adopted for the Danish trading.

27. In my experience, in certain jurisdictions it was well known that dividend arbitrage was taking place, and the authorities took no steps to prevent it. For example, I can recall Morgan Stanley being involved in dividend arbitrage relating to franked investment income arising from the purchase of shares in UK-based companies – everyone in the market knew this was happening, and it was allowed until HMRC eventually decided to change the rules to stop it. In other jurisdictions it was discouraged. From time to time in certain jurisdictions there were changes in legislation to regulate, or alternatively, seek to prohibit dividend arbitrage activity. For instance, I recall that the United States legislated against certain types of cum-cum trading, Germany did so against certain types of cum-ex trading, and a change in tax law in Switzerland prevented dividend arbitrage cum-ex trading involving short selling. Where such changes happened, in my experience the mainstream banks would, if the changes were effective, cease involvement in dividend arbitrage trading in that jurisdiction, but continue such trading in other jurisdictions they were involved in. They would do so aware of the reputational risk, and

aware that those other countries might also act to prohibit such activity, in which case they would respond accordingly.  Certainly, I did not consider that many banks considered dividend arbitrage activity to be an especially serious issue for their reputation.  During the course of my employment with both of them, there were other trades that Merrill Lynch and Morgan Stanley considered, but which they refused because of reputational concerns.  Dividend arbitrage did not fall into this category.

28.   Other risks were also relevant – counterparty credit risk (which I discuss below) and most obviously that the trading would not lead to a profit.  For example, I can recall Morgan Stanley being involved in a cum-cum trade relating to Italian shares, in respect of which it had received positive advice from the Italian law firm Chiomenti.  Whilst there was nothing to suggest that the eventual tax reclaim was in any way inappropriate or unlawful, the Italian tax authorities refused to pay it, and Morgan Stanley ultimately opted not to pursue it.  I am aware that the same was true for a number of other banks who had been involved in similar trading.

29.   Leverage played an important role in dividend arbitrage activity.  Whilst such trading was profitable, this was all at a modest level as a percentage of the share price, and so had to be done at a large volume in order to be commercially viable.  Whilst there were alternatives (such as using stock loans or repos), the easiest way of doing this would be to borrow cash from a prime broker, using your position (i.e., the client's holding of shares plus the hedge) as collateral, and on the basis that the prime broker would receive a fee and/ or a share in the profits from the trading.  As more participants entered the market, the availability of leverage went down, whilst as the prime brokers became more aware of dividend arbitrage activity they wanted higher fees and a larger share of the profits.

30.   Although I only had some involvement in dividend arbitrage trading at Morgan Stanley (and none at Merrill Lynch), I got to know colleagues who did work in that area. In my experience, during the course of the noughties many such individuals who had been involved in dividend arbitrage trading at mainstream banks left their employment there and joined small finance houses/ hedge funds, sometimes starting on their own. Accordingly, knowledge of dividend arbitrage trading strategies moved quickly in the market.  Those involved in the trading also often took with them legal advice that had

been obtained and shared it with new colleagues. They would also take with them the IP/technology of trades, as I referred to at paragraph 12 above.

**Solo Group Companies**

31.   In the wake of the 2008 financial crisis, Merrill Lynch was acquired by Bank of America, creating "**BAML**". Following the market crash, things became very quiet in the market, and I was doing very little trading at BAML. Additionally, there was a Bank of America individual who was doing exactly the same job that I was doing. Though we both got on very well, if (as was very likely) there were to be job losses, I was sure that he would be kept on rather than me.

32.   Given that uncertainty, I decided to look for a new job, and in April 2010 I joined a financial services boutique called Solo Capital Limited ("**SCL**") as an employee. SCL was 100% owned by Mr Sanjay Shah (who I refer to in this witness statement as "**Sanjay**"). I had been introduced to Sanjay and SCL by Rajen Shah, who I had known for a number of years, including whilst he was previously employed by ING, and when he was a colleague of mine at BAML (who I know as and refer to as "**Raj**").

33.   Prior to joining Solo, I had heard of Sanjay, but do not recall having previously met him. I can recall him having a reputation for being involved in dividend arbitrage trading. Raj had a similar experience to me, having been involved in the same sort of tax structuring products that I have described above. As well as Raj, when I first joined Solo, there was also Guenther Grant-Klar (who I know as and refer to as "**Guenther**"), who also came from a similar background, and who was also experienced in tax trading, having previously worked for ABN Amro. Between us, we had over 50 years of collective experience, and we had a good feel for types of transactions that would be effective (and others which we thought were unlikely to succeed).

34.   When I joined SCL, my role was to structure trades that would generate a profit, whether as proprietary trades for Solo/other vehicles owned by Sanjay, or for Solo's clients. Although none of the various components of cum-ex trading were new at that point (including the use of short-selling and net settlement to zero in an omnibus account), I worked to see how these existing mechanisms could be tweaked in different ways and

how cum-ex trading would work in different jurisdictions. I understood that I would only be paid a minimum salary (per my contract of employment, £60,000 per annum), and that any additional remuneration that I received would be on the basis of any successful trading strategy that I had contributed to. Solo would be involved in other trading, that I would not benefit from. For example, when I joined SCL, I was aware that the company was already involved in a trading activity relating to German cum-ex dividend arbitrage. I understood that I wouldn't be involved in that and wouldn't receive any remuneration from it. Similarly, I understood that if there were successful trading opportunities that were subsequently developed by Guenther or Raj, without my involvement, then I would not receive any benefit from those transactions. This was typical of the market.

35. When I first joined SCL, it was a very small organisation, employing something like 6-7 individuals. We all sat together in a fairly small office, and so initially most of our communication was just speaking to one another rather than over email. However, it very quickly grew, and I would say that within a year or so of me joining the company it had expanded to something in the region of 30 employees. Sanjay was very keen for the business to offer a number of different front-office functions, including forex and brokerage and also that there be a sufficient back-office function to support the business. Accordingly, there was a lot of growth through the hire of brokers (the brokerage services in particular growing very quickly), IT hiring, compliance, legal and operations etc. Sanjay always wanted to hire the best candidates that he could, and to grow the business as quickly as he could. I would describe Sanjay as a "blue sky thinker" and he was always keen for his companies to offer a broad range of offerings to its clients.

36. In relation to all of these activities, both Sanjay and the whole team were keen to ensure that we acted properly and in accordance with applicable laws and regulations. Sanjay was always happy for us to obtain legal advice as necessary. For example, I can recall flying to Malta to meet lawyers there in relation to a potential Spanish trade which would have been entered into by Maltese entities (but which ultimately did not proceed). I can also recall the business obtaining advice as to its custodian activities from Paul Edmondson at CMS and from Pinsent Masons. Although I did not take the lead on this (which was the responsibility of Solo's legal and compliance teams), I was involved in these discussions and I remember reviewing the relevant documentation (including the Solo custody agreement) and concluding that it was fit for purpose. The agreement for

JP Morgan to act as a sub-custodian (which I discuss further below) was provided by JP Morgan itself, and we were not able to change it. Because Solo was not itself a bank, however, we could not simply use this kind of agreement for our own clients, and so we used our own adapted version of the custody agreement instead. We also used title transfer collateral agreements (TTCAs) in order to comply with client money regulations in relation to the omnibus account.

37.  Solo's head of legal and compliance when I joined was Mr Jas Bains, who was also closely involved in these matters and who carried significant influence across the business – he had the authority to become concerned with anything he thought it was necessary for him to be involved in.  The same was true of Mr Gary Pitts, who was appointed head of compliance during the course of my employment (replacing Jas Bains). I don't recall the details of Mr Pitts' CV, but I believe he was senior with extensive compliance experience. As Solo's business expanded, it made sense to beef up the compliance side. During the course of my employment with Solo, it also employed Carla Aylott in compliance, as well as Mr Bernard Minsky as Head of Risk, and again he held significant influence across the business and could investigate all matters that he considered important. I regularly attended compliance meetings at Solo, where we would discuss matters such as onboarding clients and the terms of the TTCAs. I also recall, having been shown an email by my Legal Team from August 2012 (document ID {MTKC3/375} SKEL00175539), that Gary Pitts asked me to assist with a "*compliance risk assessment*" of Solo's custody business, which I did.

38.  In this regard, I have seen from various e-mails shown to me by my Legal Team that towards the end of my employment with Solo (as I refer to below) in around February 2013, Gary Pitts had expressed a concern as to whether Solo's custody business (known as Global Securities Services ("**GSS**")) was functioning lawfully.  Accordingly, he was keen to obtain an overarching legal advice to consider the same. I should be clear that this advice (like the risk assessment referred to above) would relate to whether Solo's custodian activities complied with UK law and regulation, rather than to any questions of foreign tax law relevant to the trading activity (which I discuss below). For my part, whilst I believed that the GSS was functioning lawfully and appropriately, it was obviously important to ensure that this was the case, and I was happy to support Gary Pitts in obtaining the advice he was seeking. Indeed, since Gary Pitts was the Head of

14

Compliance, I would not have been in a position to prevent him from getting that advice even if I had disagreed with him, which I didn't. My only concern about this was ensuring that Gary properly understood how the GSS platform functioned before taking advice, to ensure the advice obtained was worthwhile. However, I was sacked from the firm before we were able to progress this and I do not know what became of it.

39.  Once Solo and its clients were satisfied with the essential structuring of the trading, it was necessary to plan the particular trades. Prior to the trade date, the representatives of the long client – i.e., the USPF making the purchase – would decide the basic elements of the trade (i.e., what volume of shares it wished to acquire from what company or companies). The USPF and Solo would both be aware of the dates on which the relevant companies would declare dividends because this information could be found on Bloomberg and was publicly available on the internet; Raj and I would create dividend calendars for the most suitable stocks (in terms of liquidity, market capitalisation and dividend yield) in each jurisdiction and share these with the USPFs. Solo (usually via Sanjay) would help the USPF decide what a reasonably prudent volume of shares to be traded was, keeping in mind reporting, operational and risk management limits. (These reporting limits concerned reporting of volumes to the London Stock Exchange and the Danish authorities but it was common for traders (not just at Solo) to stay below these limits because trading above them could give rise to takeover speculation and thus market price movements.)

40.  Solo would then work to source entities to act on the short side and provide liquidity, agreeing with those entities the terms on which they would trade (essentially, the volumes of shares each short seller would sell). Solo would also be responsible for sourcing the other participants, such as the brokers, stock-loan counterparties, and coordinating with the futures general clearer in relation to the futures which would hedge the share purchase. It was hardly a surprise that the principals of these various participants were people known to Solo personnel. Obviously, you wanted to do business with people you know and trust, and you needed to have confidence that the other participants knew how the trading worked and what they were supposed to do, to avoid problems on the trade date.

41.  However, in terms of the execution of the trades, Solo would not and could not be responsible for the trading that the client engaged in with its broker. Where Solo was acting as custodian, our responsibility was just that – the custody of assets on behalf of a client.  Even where we, as structurers, had designed the IP/technology for a specific set of trades, it was always the clients' decision to enter into those trades. Similarly, it was up to the other participants in the trading activity, such as the short sellers, whether they wished to trade – they were independent, unrelated parties (i.e., not parties under common ownership) who wished to make a profit. Just because they were people known to Solo, or who had done business with Solo before, did not mean that they were in any sense under Solo's control or that these were not genuine transactions, as SKAT has alleged. So far as I was aware at the time, all of these other participants (the representatives of the USPFs, the short sellers, the brokers, the stock-loan counterparties) knew and understood the trading model and how it worked.

42.  This was true for the entirety of my employment by Solo, and for the subsequent period of my involvement in the matters giving rise to these proceedings, as I refer to below.  I had always understood that Solo's clients (which I refer to below) had taken their own independent legal advice, and it was certainly their decision to enter the trading. I would sometime have telephone conversations with the clients about particular trades, but that was more Sanjay's area, as he was actually a trader, and I was never responsible for approving trades. As I have said, my role was more at an early stage, as a structurer of the overall trading strategy.

43.  Nevertheless, where clients were involved in specific trading activities, we still considered it prudent to obtain sufficient tax advice to demonstrate that the proposed approach was plausible.  We could never obtain full legal advice, by which I mean advice on a specific trade proposed by a specific client, as we did not know the full picture of the client's situation, but if we obtained legal advice demonstrating that a client's proposed trading would not result in a successful application for a tax reclaim, then we would not permit the client to carry out such trading on our platform.  For example, I can recall that around late 2011 or early 2012 we took initial advice (orally) from a Swedish law firm in relation to proposed cum-ex trading in Sweden (similar in structure to the Belgian and Danish trading). But that initial advice made clear the trading wouldn't work (although I can't remember the precise reason why not) and accordingly the US pension

funds did not pursue such trading. Solo may also have done the same in relation to potential Spanish cum-ex trading.

**Argre**

44.  Prior to my arrival at Solo, Sanjay and Raj already had an existing relationship with a US entity called Argre Management LLC ("**Argre**"). Argre was a group of very wealthy individuals with experience in capital markets (particular in tax), who had funds (both their own and funds belonging to other investors) which they wished to use in trading strategies. I can recall Raj and Sanjay telling me that they had been introduced to the individuals behind Argre by a third-party introduction agent, Robert Klugman. I did not know the individuals behind Argre when I first joined Solo, though I was aware that they were involved in the German trading that I wasn't involved in as referred to at paragraph 34 above. However, during the course of my employment with Solo I got to know them fairly well and frequently spoke to them and exchanged emails with them – they were Matthew Stein, Jerome L'Hote, Richard Markowitz and John van Merkensteijn.

45.  All of these individuals came from impressive tax and financial backgrounds, and had a good understanding of structured trading and dividend arbitrage activity, and the work involved to make such trading happen (e.g. the IP/technology as I refer to above). I recall that one had been a partner at Goldman Sachs and another a partner at KPMG, and that one had been a tax expert at KPMG. None of them needed much education from Solo on the proposed trading. As per Solo, they were keen to explore dividend arbitrage in multiple different jurisdictions, and we had regular conversations and e-mail exchanges relating to such opportunities. From my conversations with the various individuals, I was aware that they were taking independent legal advice relating to possible trading opportunities. I can also recall that I introduced them to Mr Haelterman, and my solicitors have shown me an email effecting this introduction dated 18 April 2012 (document ID SKSK00544117).

{CMTKBA/768}

46.  The US Pension Funds ("**USPFs**") that ultimately entered into the trading that is the subject of these proceedings were introduced to Solo by the individuals at Argre, and the decision to enter into that trading was made by those US Pension Funds, via their authorised representatives. The trading was best carried out by pension funds, because

17

these were entities that enjoyed full tax relief under the US-Denmark double-taxation treaty. At one stage, Solo did look into the possibility of setting up its own pension fund to capture the profits from trading (trading in general, rather than related to any particular strategy). But we decided that this would create an unnecessary burden administratively, and so it never went forward. In my time at Solo, we were never engaged in establishing or administering the USPFs, since we did not have the expertise. Nor did Solo act as the investment manager for any of the USPFs. I understand that later on Solo became involved with Malaysian entities, but I had no involvement in that.

**My Career at Solo**

47.    As above, I joined Solo Capital Limited on 3 May 2010. In January 2011 I was made a director of the company. In reality, my appointment as a director did not change my day-to-day role, nor the basis of my remuneration as referred to above. As above, that role remained the identification, implementation and management of structured trades on behalf of Solo and/or its clients, all with a view to seek to generate profit for the business, alongside more general supervision in my role as chief operating officer and board member.

48.    During the course of late 2011/early 2012 (I cannot recall precisely when) Sanjay decided that Solo Capital Limited should effectively be reconstituted as an LLP and arranged for the incorporation of Solo Capital Partners LLP ("**SCP LLP**"). Accordingly, in April 2012 I resigned as a director of SCL and was designated as a member of SCP LLP. At this time I was appointed as one of three Managing Partners of SCP LLP. Again, this did not really have any real impact on my day-to-day work or the basis that I would be paid, which I deal with further below.

49.    Throughout 2011 and 2012, many of Solo's key employees moved to Dubai. Sanjay was already based there, and Raj moved to Dubai during this period. Major decisions made by the company during this period were made in Dubai, and I felt a little distant from that. At this time, the financial services world remained very quiet in the wake of the financial crisis, and there really weren't very many jobs at available. Solo felt a good place to be, and whilst things weren't perfect, I got on well with Raj, and had a decent relationship with Sanjay. I remained keen to be a part of the business, and so decided to

move to Dubai.  I discussed this with my family, and my original intention was that all of us would move to Dubai.  It was intended that this would happen in late 2012. However, ultimately my wife and the children decided to stay in England, and I moved to Dubai on my own, which I did in February 2013.  My appointment as a member of SCP LLP was terminated on 14 March 2013 and at this time I became an employee of Solo Capital Dubai Limited ("**SCDL**").  Again, though now in Dubai, this change of employer did not really have any major change in my day-to-day work for the company other than removing various governance and administrative responsibilities.

50.   On 8 April 2013 I was appointed as a director of Ganymede Cayman Limited ("**Ganymede**"), and certain other Cayman and Lux entities.  Ganymede was an entity incorporated and controlled by Sanjay.  I do not know why it had originally been incorporated, but at the time of my appointment it was the entity that was invoicing the US pension funds for the consulting services that were being provided.  I can recall that the 3 Lux entities I had been made a director of were for the purposes of the Luxembourg ruled trade that Solo was concerned with.  I do not recall the precise purpose of the other entities that I was made a director of, or whether they had one at all, but these would all have been entities set up for trading purposes.  It was not unusual to be appointed as a director of SPVs like this – I was a director of 22 entities during the course of my employment at Morgan Stanley, and 14 at Merrill Lynch.  I do not recall undertaking any specific work as a director of any of these vehicles.  With me now being based in Dubai, my appointment was purely for convenience (using anyone tax resident in the United Kingdom brought with it the risk of the vehicles potentially being considered UK tax based and subject to UK corporation tax).

51.   In fact, this employment was short lived. Raj left the business in April 2013 (though I had stayed in contact with him); he had become tired of the work and having to deal with Sanjay, and considered that Solo had become too focussed on activity that didn't interest him, such as brokerage. Once in Dubai, tensions between Sanjay and I started to rise. Sanjay considered that I had done what he wanted me to do, in identifying profitable cum-ex trading activity, but did not want to have to keep paying me a share of those profits. On a day in June 2013 (I cannot recall precisely which), Sanjay called me to his office, and asked me to leave the business, immediately.  We had a discussion about monies I was due (which I refer to below), and once that was agreed I was content to

leave.  This was not abnormal for the financial services world and I have seen it elsewhere during the course of my career.  It was Sanjay's prerogative.  When I left Solo, as would have been expected I also resigned my directorships of the various SPVs referred to at paragraph 50 above.

52.  Sanjay changed the codes at SCDL's offices in Dubai, so when I returned a few days later to collect a few personal items, I was not able to enter the offices, and was refused entry (although a colleague brought my items to me).  For reasons that are not known to me, Sanjay also instructed SCDL's employees not to meet me with personally in Dubai, though some of them ignored this and continued to meet me.

53.  I'm aware that in the following years during which I and others continued to provide assistance to the US pension funds involved in the trading, Sanjay viewed us as "competition" and tried to take steps to prevent us from being able to provide such services.  For example, I was aware that he had tried to enter into exclusivity agreements with various of the tax agents to prevent them from processing reclaim applications originating from US pension funds where we had provided consulting support.

54.  As it turned out, these efforts only had limited success - during the course of the consulting services that I provided to Oryx, Acupay told us that, because of arrangements they had agreed with Sanjay, they would not process reclaim applications from US Pension Funds that Oryx had provided services to.  However, Goal told us that, though Sanjay had similarly sought to stop it providing services to clients of Oryx, Goal still felt able to service Oryx's clients because of the wording of their agreement with Sanjay.  Nevertheless, as I detail below, some of the steps that we took were, at least in part, to reflect concerns that Sanjay would seek to further "spike" us, and to protect us where he did attempt to do so.

**Experience of pre-Danish trading at Solo**

55.  As I mentioned in paragraph 34 above, Solo was involved in a number of dividend arbitrage strategies between 2010 and 2012, not all of which involved me. I was aware of the German cum-ex trading, because Solo's clients were Argre and I had a decent relationship with them, but I was not personally involved in the German trading and did

not receive any remuneration from it. I was aware that Deutsche Bank had provided prime brokerage services for some of this trading but resigned at some point. I do not know why, but it may have been because Deutsche Bank is a German bank and so may not have wanted to be involved in German cum-ex trading; or, conversely, because Deutsche Bank was also acting as principal in such trading and so did not want also to be acting as prime broker to support trading by other parties.

56.    In addition to the German cum-ex activity, around April 2012 Solo also looked into the possibility of dividend arbitrage transactions for French shares, making use of the UAE-France double taxation treaty. Although I was aware of these discussions within Solo because of my position, I was not really involved in them. The idea was led by another structurer, Gerry O'Callaghan, who I believe used to work at Credit Suisse. Had the trading gone ahead, it would have been Gerry's P&L rather than mine. I don't believe it did happen, although it may have done after I left. This was not unusual – structurers trade ideas all the time, most of which never happen. Solo also provided custodian services for Austrian cum-ex trading, where we had obtained advice from a local law firm called Leitner & Leitner, although it was never very profitable because it only involved small volumes of shares. Towards the end of my time at Solo there was a change in practice in Austria which meant that the position was unclear (and my Legal Team has shown me an email from Leitner & Leitner dated 10 April 2013 warning Raj about the

{MTKC7/270}    consequences of this change (document ID DWF013572). I don't know what Solo did in response to that (e.g., whether it stopped being involved in Austrian dividend arbitrage or sought further legal advice in Austria) because I left Solo shortly afterwards. I should add that this change was specific to the Austrian tax regime and did not cause me concern over any of the trading in other jurisdictions that Solo's clients were involved with, including the Danish trading.

57.    I was more involved in dividend arbitrage trading in Belgian shares. As I mentioned in paragraph 25 above, I was aware from my time at Merrill Lynch that Freshfields had advised that cum-ex transactions could lead to valid applications for withholding tax reclaims in Belgium. At some point after I joined Solo (although I don't recall precisely when) I attended a conference in London organised by Freshfields for their clients who might be interested in dividend arbitrage trading, which included talks from Freshfields partners from all over Europe – Spain, France, Belgium Germany, although I don't think

from Denmark. I attended as a structurer from Solo; I believe others from Solo also attended, but I am now not sure who. The other attendees were people from hedge funds and banks – a whole load of investment managers and principal investors who were interested in dividend arbitrage, including my old boss from Merrill Lynch, Steven Blase.

58.   I remember I had a conversation with Axel Haelterman from Freshfields– either at the conference or afterwards – about Belgian dividend arbitrage trading, and he said that Belgian cum-ex trading worked – you could get a favourable tax opinion in Belgium and validly claim withholding tax refunds. Given that we regarded him as maybe the leading financial services tax adviser in Belgium, this strongly suggested Belgian cum-ex trading would work. We at Solo then looked into it further and discussed it, and decided it would work – by which I mean that the trading would result in a successful and legitimate application to reclaim withholding tax. This view was supported by the legal opinion addressed to me from Axel Haelterman dated 23 December 2011 (document ID

{CMTKBA/774}   SKSK00569362) , and in particular paragraph 3.3, which includes the advice that, in the case of a short sale, "*the dividend compensation payment [i.e., the Market Claim] has been treated in the past as a dividend*" (which accords with my own understanding of the position). I have also been shown an email from a colleague of Axel Haelterman at Freshfields to me dated 13 March 2013 (into which Axel Haelterman is copied) reporting a possible change in the Belgian withholding tax regime and referring to Freshfields' recommendation to avoid "*closed-end set-ups, e.g. immediate or pre-ordained onward

{MTKC1/905}   sale with physical settlement*" (document ID BARAC00030945). I recall that this change did not affect the position of USPFs (and so did not cause problems for the trading involving Solo's clients, and that neither the Belgian trading nor the Danish trading involved the sorts of immediate onward sale which Freshfields were concerned about.

59.   Argre had their own contacts but I mentioned Axel Haelterman to them as a leading taxation and financial services expert in the Belgian market. They asked me to introduce them to him, which I did, and I may have been involved in helping Argre prepare instructions for Freshfields. I did not take part in their discussions with Freshfields, however, and so do not know what was said, and I never saw a copy of any finalised advice, which Argre preferred to keep confidential. I do recall seeing at least one advice in draft, and that the tenor of that advice was that Belgian cum-ex trading worked (as

Axel Haelterman had told me when we spoke at the conference). Solo clients associated with Argre began cum-ex trading in Belgian shares some time in the first half of 2012.

{MTKC3/437}

60. I have been shown an email chain by my Legal Team (document ID SKEL00176543) dated 11 September 2012, in which Sanjay forwarded to me and Raj an email he had received that day from Ross McGill, who worked for GlobeTax, a reclaim agent known to Sanjay. Sanjay had the idea that Solo could process reclaim applications itself on behalf of the clients and had signed up GlobeTax as Solo's agent. Mr McGill, in that email, refers (in the second paragraph) to a "*manufactured dividend*" and (in the fourth paragraph) warns that Solo's clients in the Belgian trading did not in fact have a valid entitlement to a tax reclaim. I did not (and do not) regard these statements as correct – the reference in the second paragraph should be to a "*market claim*" (in the sense which I explain in paragraph 17 above), and a manufactured dividend (as I explained) properly refers to a dividend that arises in the context of stock-lending or repos. Belgian tax law analysis is outside Mr McGill's expertise as a tax reclaim agent. Mr McGill's view was directly contrary to the advice we had received from a leading specialist, Axel Haelterman. Mr McGill then (in the fifth paragraph) suggests that Solo "*resolve the matter*" by settling credits to the long accounts with debits from the short accounts – but that is what Solo's clients would already have done in the trading. In my view, Mr McGill's suggestion was nonsense and shows that he did not understand the trading which Solo's clients were proposing to undertake.

61. Although I regarded Mr McGill's view as wrong, we nevertheless discussed it with our clients (i.e., Argre) who were happy to go ahead with the trading on the basis of the advice from actual Belgian tax advisers (i.e., Axel Haelterman at Freshfields). I did not think Solo should use GlobeTax, on the basis of Mr McGill's misunderstanding of the trading, and because it was unnecessarily complicated for Solo to be processing the reclaims itself (via GlobeTax) rather than leaving that to the actual clients. We decided not to offer tax reclaim services ourselves and not to work with GlobeTax, and to leave it up to the clients whether they used GlobeTax or another agent.

62. In order to facilitate dividend arbitrage trading for its clients, Solo established relationships with various other financial institutions. We used JP Morgan as a sub-custodian for dividend arbitrage trading (including the associated futures trades) as well

as for proprietary futures trading (which was Sanjay's area rather than mine). For the dividend arbitrage trading itself, there was no need for the physical delivery of stock or margin, and Solo did not need to send positions down to JP Morgan because we netted off the (equal and opposite) trades in Solo's omnibus account. At different times, Solo also used other sub-custodians: I recall Merrill Lynch and Macquarie. We were aware that JP Morgan had experience putting in tax reclaims, but it was not their core business, and they would only have made a very small amount of money (by their standards) for performing this role for Solo (by comparison to the amounts they were making acting as Solo's sub-custodian). I do not think that JP Morgan would have been interested in doing tax reclaims for Solo and our clients themselves used specialist reclaim agents instead (and I have been shown an email dated 10 July 2012 from JP Morgan to Raj (with me in copy) which refers to their "*lack of support*" for making reclaims (document ID SKEL 00171854). We had also looked into using Citi as our prime broker for cum-ex trading, which Citi was not able to do, although they were prepared to offer pledge financing for cum-ex, on appropriate terms.

{MTKC3/46}

63. We also engaged brokers, although I now do not recall all their names, since it was not my role to engage them. I am aware there has been some consideration by expert witnesses in these proceedings as to whether the brokers were acting as Matched Principal. I recall that there was some discussion of this question at the time of the trading, but I do not remember the details of those conversations, nor whether any clarity was reached on this issue. Some parties, such as Newedge, were not interested in supporting dividend arbitrage because it was outside their risk appetite and so, to the extent that Solo did use them, it would have been for other trading activities, such as the algorithmic equities trading run by Edo Barac. The fact that other entities considered dividend arbitrage to be outside their appetite for reputational and legal risk did not raise concerns with me. On reputational risk, there was a range of views in the market about the acceptability of dividend arbitrage trading. On legal risk (as I explain) Solo would get sufficient external advice on any trading strategy to get comfort that it worked in principle. As I explain in paragraphs 41 to 42 above, that was all Solo could ever do in terms of getting advice on a trading strategy; the advice on whether a specific transaction would work was a matter for the particular client. I would keep an eye on developments in withholding tax regimes in jurisdictions where Solo was involved in trading to

consider whether advice needed to be updated (or our legal advisers would inform us themselves of changes, as Freshfields did in Belgium).

64.    I also had no real involvement in the introduction of other participants in the trading (e.g., the short sellers), many of whom were contacts of Sanjay.  I met various of them (such as Owen Mitchell, Rajeev Dave and Nailesh Teraiya) from time to time (for example when they visited Solo's offices) but did not have substantial dealings with them during the course of the trading as this was outside of my remit. I would have visibility on the process by which the short side of the trading was allocated by volume of shares to particular entities, but I did not drive that process at Solo; that was Sanjay's role, because he knew these participants. I am aware that SKAT has alleged that some of these short sales were uncovered (or 'naked') sales, but so far as I was aware this was not the case in the cum-ex trading I was involved with or subsequently – the short sellers always had the necessary arrangement in place to cover the trade. It was also Sanjay's role to agree how the profits of the trading would be split among the USPFs, Solo and the other participants. My understanding of the market was that it was usual for the prime broker or custodian to receive the majority of the profits, because of the important role it played in bringing the various participants in the trading together and ensuring that the trading was executed properly.

65.    In addition to dividend arbitrage trading in this period involving Solo, I was aware that other entities were involved in similar activity (as was the case during my time at Morgan Stanley and Merrill Lynch). Although other participants would obviously not want to share their IP/technology with Solo, as a rival, we – especially Sanjay – knew a fair amount of what they were doing in terms of jurisdictions and strategies through talking to advisers and others in the market. For instance, around or before the time Solo became involved in Belgian trading, I was aware that Macquarie, an Australian bank, was acting as a custodian for Austrian cum-ex trading and using similar net settlement techniques to those we later used at Solo for the Danish strategy. Macquarie were a very active prime broker and a big player in the tax space generally.

**Genesis of Danish trading at Solo**

66. I don't remember who suggested Denmark as a territory for trading, but it was not me. Gerry O'Callaghan had experience in Denmark, and he, Raj and I discussed the proposed trading. The basic structure of the cum-ex trades, including hedging shares with futures, was well-established by that point. The documentation for the trades were largely standard-form agreements such as the GMSLAs for the stock lending and the FIA give-up agreements. The idea of internalised settlement and netting to zero, which Solo used for the first time either in the Danish trading or in some Belgian trades earlier in 2012, came partly from Sanjay and partly from some investigations made (I believe) by Guenther and partly from some market intelligence which Adam Forsyth had found. I recall that someone from Solo (not me) attended a meeting or conference organised by CACEIS Bank which added to our knowledge.

67. We discussed the legal analysis of netting (including net settlement to zero), as well as Title Transfer Collateral Agreements (or TTCAs) and custody more generally, with Paul Edmondson at CMS. I (with Jas Bains of Legal) was involved in some of those conversations, and Raj also had some involvement. The advantages of netting were that it removed the need for leverage (which had got expensive and hard to obtain by that stage). A secondary effect of using an omnibus account was that it largely reduced counterparty credit risk (although it was impossible entirely to eliminate this risk, for instance if it transpired that a third party had a prior claim over a participants' assets). These features (along with the matching of equal and opposite trades and the fully hedged nature of the trades) meant that the entities participating in the trading did not need to have substantial assets, because the risk of default by any party was low and the consequences of any such default for any other party would likely be contained. I did not regard net settlement to zero, and the consequent elimination of the need for external cash or shares, as being in any way a problematic concept. Equities trading was already wholly dematerialised and electronic, with no physical movement of cash or other assets; and netting within an omnibus account was likewise well-established. Solo's approach simply involved the use of these techniques in their purest form.

68. We had frequent conversations within Solo over how exactly the trading might work before we sought Danish tax advice. As I have explained in paragraphs 36 to 42 above,

Solo's approach when investigating a new trading strategy was to obtain sufficient tax advice to demonstrate that the proposed trading ought to result in a valid tax reclaim (although obtaining detailed legal advice on the specifics of the trading was the responsibility of Solo's client that would be making the reclaim – as Argre had done in respect of the Belgian trading). This is something that Solo's compliance and legal teams expected us to do, although they would not necessarily have reviewed or given a view on the advice we received themselves, because it was very specialist (being non-UK tax law) and outside their area of expertise (by contrast to, say, the advice we received on the custody agreements from CMS Cameron McKenna).

**Danish tax advice at Solo**

69.    I have refreshed my memory of taking Danish tax advice by reviewing contemporaneous documents (which I would have seen at the time), referred to below.

70.    Raj and Gerry discussed which Danish tax adviser to use by email dated 9 May 2012; this was forwarded to me nearly two weeks later on 21 May 2012, although I don't remember discussing it (document ID SKEL00097778). Gerry said that Arne Riis of {MTKC2/541} Bech Bruun would probably be used by Arunville, who were another dividend arbitrage house. I do not know for sure whether or not they were also doing Danish trading, as it was hard to tell whether rumours were true. Nikolaj Bjornholm of Hannes Snellman ("**HS**") is described by Gerry as being the "*most commercial*", which I understood to mean that he was familiar with commercial transactions and in particular the financial markets. Not every lawyer in a smaller jurisdiction like Denmark would have that familiarity, and Solo did not want an adviser who had to start from first principles because he had not heard of a future, for example. HS also seemed a good choice because Gerry said he had used them before; given that he had previously been at Credit Suisse, this gave HS credibility. I have been reminded by an email dated 29 May 2012 from HS to me that HS estimated a fee of £5,000-£8,000 for the advice (document ID {MTKC2/624} SSHA00011975). This was about what I had expected; in my experience, European lawyers are far cheaper than English lawyers, although that doesn't mean that the quality of work is inferior.

71.   On 23 May 2012, I sent an email to Nikolaj Bjornholm of HS referring to a call the previous day (document ID SSHA00011911). I do not really remember that call, but the "*fact*" pattern I set out in the email is the same basic fact pattern which Solo had used for the Belgian cum-ex trading and the German cum-ex trading (although I am not sure whether a stock loan was used in Germany).   This is an e-mail that I drafted in conjunction with Raj, whilst Sanjay also had sight of it.  When I use the word "*unrelated*" (in paragraphs 3 and 4), I mean that the participants referred to have no common ownership. So far as I am concerned, that is the correct use of the word in a tax context – obviously the participants had contractual relationships with one another, but that is not what I am talking about and that does not mean that the parties are not independent or somehow under the control of Solo.

{MTKC23/810}

72.   There are certain elements of the fact pattern that I express as possibilities because we had not fully tied down the fact pattern at this stage.  Additionally, when first taking advice from lawyers such as HS, we were always keen to work out which points were important and which not – a bit like poking a wire to find sensitivities, so that you could determine what were the most significant issues and find the best way of doing a trade. It did not make sense to present a set of trades as a fait accompli – it was better to present them in more general terms.   So while I refer to the purchase of the shares using "*single stock physically delivered futures flex contracts*", in the end we did not use physical futures, because we decided it was too complicated and unnecessary. Similarly, whilst I also refer to settlement after the ex-date as a possibility, this was not something that HS raised as being significant (presumably because they recognised the trade date rather than the settlement date as being relevant for tax purposes), and in any event we had all of the transactions settle after the ex-date.   When I refer to the use of a stock loan as a possibility, this is because we were considering a number of different methods of financing the Danish trading, such as collateralised borrowing (which would have been very expensive) or repos (which it was felt would be too complicated and might affect the tax treatment). This was just an initial discussion with HS – the precise structure of the trading was to an extent still a work in progress and we still needed to iron out the detail.

73.   When I refer (in paragraph 5) to the USPF's entitlement to the "*dividend*", I use the term here as I do elsewhere in my communications with HS – a Market Claim, which the

USPF was entitled to receive because they purchased shares prior to the ex-date. I did not mention net settlement to zero at this stage (although we were considering using it) because I did not consider the process of settlement to be relevant to the initial instructions. I expected HS to raise any other factor which they thought relevant to their advice, and that is what HS then did with net settlement (as I explain below). Nor did I refer to short selling in this initial email, because at the time no-one in the market (including SKAT) considered that the nature of the seller was relevant to the tax treatment of the purchaser, and I was not interested in the tax treatment of the short seller.

74.    Following the receipt of a first draft on 2 June 2012, on 13 June 2012, Anne Becker-Christensen of HS sent an email to me and others at Solo attaching a revised tax opinion

{MTKC23/792}    (document ID SSHA00011880). There were a number of revisions, and, although I cannot now remember the detail of our discussions with HS, I believe these would have arisen from further conversations over the telephone with me and Raj over the detail of the proposed trading and on the basis of the original draft. I agree with the description of the transactions on pages 1-2 of the draft opinion. On page 2, there are two new assumptions in paragraph 4 – numbers 5 and 6. I do not recall specifically what led HS to add these assumptions – they may have been things they chose to put in rather than because of anything we said. Assumption 5 I regarded as correct – the USPF would, in my view, have been the full beneficial owner of the equities, with the risks and rewards including the "*right to receive the dividend*" on the Dividend Declaration Date. I did not consider that short selling made any difference to that position of the USPF as economic owner. Assumption 6 I did have a problem with – because of net settlement the ownership of the shares would not be traceable, and the USPF would not be recorded as the owner of the equities at the CSD. The conclusion of the advice (paragraph 5) remained the same: that the proposed trading would work and the USPF should be entitled to claim a full refund of Danish dividend withholding tax under the US-Danish treaty. This same conclusion appeared in all subsequent drafts and in the final opinion.

{MTKC23/795}    75.    A week later, on 20 June 2012, HS sent us a further draft (document ID SSHA00011884). This followed a call on 17 June 2012, when I do recall that we discussed net settlement. The change at paragraph 3(2) of the draft was to bring the terminology more closely in line with Danish company law and to clarify the meaning of "*Dividend Declaration Date*". The change at paragraph 3(5) was because HS preferred to refer to the "*dividend*

*record date*" as being more relevant to the tax analysis than the "*receipt of the Danish Dividend*", but which date it was made no practical difference to Solo because the equities were going to be held for a couple of months anyway.

76. Of the assumptions, number 5 – about the right to receive the dividend – was left as it was, and I regarded it as correct. Assumption 6 had been changed to state (correctly) that "*the Equities will be held by USPF through a custodian*", and (also correctly) that "*USPF's ownership to the Equities will be recorded with the custodian*". However, the draft went on to state (incorrectly) that the custodian "*will be recorded as the custodian holder of the Equities*" with the CSD. This was inaccurate: because of the netting off of positions within the omnibus account at Solo, the ownership of the shares would not have been visible at the CSD. I had explained net settlement on the call on 17 June 2013, including net settlement to zero and the lack of traceability to the CSD. I cannot recall whether this was the first time we discussed it, although HS may not have focussed on it until then. HS did not express concerns on that call about net settlement, but just said that they wanted to go away and think about it, which they evidently did. They got it wrong in this draft, which suggests that they misunderstood our call on net settlement. I did not regard this misunderstanding as uncommon, however – it was very unusual for an adviser to iron out every point in the opinion in one go.

{MTKC23/798}

77. Later that day (20 June 2012) (document ID SSHA00011887), I sent Raj a draft email to HS, attaching a further version of the opinion. I had discussed these with Raj, and I cannot now remember precisely which of us suggested the particular changes. In the email I explained the reasoning for the relatively minor changes to paragraph 3 and to assumption number 5. On assumption 6, we deleted the statement that the custodian "*will be recorded as the custodian holder of the Equities*" with the CSD and I explained in the email why that was incorrect: "*the custodian's ownership records will depend upon the combination of other long and short positions that it has entered into at the same time as this specific share purchase*". I regarded that as a sufficiently clear explanation of the position for the purposes of the opinion; if HS did not understand or disagreed with the amendment, I would have expected them to challenge it and propose alternative language.

78.  Raj made some further amendments to the draft opinion on 25 June 2012 (although not

{MTKC23/799}  to assumption 6) and I sent it to HS later that day (11:22) (document IDs SSHA00011891

{MTKC23/802}  and SSHA0011897). A few hours later (14:41) (document ID SSHA00011899), HS {MTKC23/803}

replied agreeing with the changes, other than querying the deletion of the reference to the

CSD in assumption 6 on the basis that "*even though the custodian's ownership records*

*will depend upon the combination of other positions that it has entered into, we assume*

*that the custodian, or a sub-custodian, would be registered as the holder of the Equities*

*with the Danish Securities Centre*". HS also asked, if I disagreed, "*who would be*

*registered with the Danish Securities Centre as the holder of the Equities upon USPF's*

*purchase thereof*". It was clear from this email that HS still did not properly understand

netting and how the custody chain would work. I did not regard this as that surprising –

even though we had selected HS because they were regarded as commercially

experienced and expert on the tax analysis of securities trading, custody and settlement

are the invisible part of the financial markets, and so HS may not have seen the process

of netting in an omnibus account before, even though I had explained it to them.

79.  The next morning (26 June 2012), Raj emailed HS (with me in copy) referring to an

amendment to assumption 6 "*to reflect our discussion earlier this morning*" (document

{MTKC23/805}  ID SSHA00011901). I now cannot recall specifically whether I took part in that

discussion, although I did take part in most of our five or six calls with HS. Raj's

amendment stated that the USPF's ownership of the shares would be recorded with the

CSD "*depending upon the custodians [sic] other long and short positions*". I understood

that to make clear that, if those other positions were netted off, then that would mean that

the USPF's ownership of the shares would not be recorded at the CSD – which was

correct. I then sent a further email to HS that morning with a minor amendment to

assumption 6, clarifying that registration at the CSD would depend not only on the

custodian's positions, but also those of any sub-custodian (document ID

{MTKC23/807}  SSHA00011903).

80.  HS replied on the afternoon of 26 June 2012 with a further draft (document ID

{MTKC23/808}  SSHA00011905). Although, as I have said, net settlement was not something that HS

had seen before, the first paragraph of that email suggests to me that (presumably as a

result of the earlier discussion that day), HS did now understand the concept and the fact

that it was only registration at the CSD, rather than with the custodian, which would depend on the long and the short positions.

81.  HS had also added a new assumption 7. I cannot now remember whether that was the result of a conversation that day or whether it was something which HS had drafted in as a result of their own thinking and wanted to know whether or not Solo accepted it. The new assumption read: "*The custodian's records will show that USPF is the legal and beneficial owner of the Equities on Dividend Approval Date and that the Danish Dividend represents a real dividend on the Equities which is passed on to USPF by the custodian*". In the email, HS explained that they had added this assumption because of the change to assumption 6 and because HS needed "*to reflect somehow that the payment for which USPF will claim treaty benefits is de facto a dividend payment which USPF has received, as a shareholder, from the dividend distributing Danish company (via the custodian)*".

82.  I understood the reference to a "*real dividend*" in assumption 7 to mean a dividend, received by the USPF from the custodian, in the form of a Market Claim and not, for example, a manufactured dividend. That was my understanding because I did not consider that the use of short selling would affect the USPF's entitlement to a dividend and I did not regard the traceability of that dividend to the CSD or the method of settlement at the custodian as being relevant to that entitlement. Because, as I understood Danish tax law, the dividend became taxable when it accrued (i.e., on the trade date) rather than when it was received, traceability to the CSD and the settlement process did not matter. I understood this point and I believed that HS understood it too. My Legal
{MTKC8/641}  Team has shown me an email dated 1 July 2013 (document ID SSHA00011966) from HS to Jessica Hammers of Solo's legal department which explains that "*the taxable event is the declaration of dividend [sic] and not the receipt of the dividend*"; this is consistent with my own understanding. The reference to a "*dividend distributing Danish company*" was merely a reference back to the Danish company whose shares would give rise to the dividend. I understood the reference in the covering email to a "*de facto a dividend*" in the same way – that is, a Market Claim which the USPF has received into its custody account as the result of its ownership of the relevant shares.

83.  I therefore thought that HS's changes were fine – after multiple discussions and drafts, I thought that they had sufficient understanding of the trading, of net settlement and the role of the CSD, and that HS had expressed this in language that they were happy with and Solo were happy with. We were all very familiar with the issues by this point and I believe they had been covered off. I therefore wrote to Raj shortly afterwards: "*looks fine*" (document ID SSHA00011907).

{MTKC2/903}

84.  Once HS had finalised the opinion, Raj sent it on to Argre. I believe he did that because he wanted to be helpful – HS's advice was to Solo, not Argre, but there was no harm in sharing it with the clients. Because the principals of Argre were themselves experts on international tax, if we or HS had made any lazy or inappropriate assumptions in the opinion, then they could have picked them up. They would have been used to seeing tax opinions from all over the world, and had they seen anything in the HS opinion that seemed incorrect, I would fully have expected them to say so, based on their level of seniority and level of experience. They did not raise any concerns, and this did not surprise me. The HS advice looked good to me, and I considered that it went into the level of detail that I had expected, based on other similar advices Solo had obtained on other jurisdictions (as well as on advices I had seen in my time at Morgan Stanley and Merrill Lynch).

85.  In paragraph 38 above, I referred to Gary Pitts' plan to obtain an overarching legal advice on Solo's GSS. I should make clear that that advice (which I never saw in the end) was envisaged to consolidate the advice we had taken on UK legal and regulatory matters such as custody arrangements, client money rules and the TTCAs. It was not intended to cover foreign-law advice on whether the trading worked from a tax perspective, such as the HS advice, since that was not an area in which Solo's compliance team had expertise, and we were satisfied with the advice we had got. I would have reported the advice at board level, however, and Sanjay definitely saw it. If anyone such as Jas Bains had asked to see it, I would have shown them. I do not recall whether this happened.

**Dividend Credit Advices and my role in Danish trading at Solo**

86.    I have been shown several Dividend Credit Advices ("**DCAs**") in the course of preparing this statement, and I discuss them below. I should start by explaining my understanding of what a DCA was and of its purpose.

87.    I do not regard the precise name of the document as very important - a DCA is simply a document produced by a custodian for its client when that client receives a dividend payment to its account with that custodian. It is a fairly market-standard document, and all of the DCAs produced by banks will look rather similar; they contain materially the same information, even if they may be slightly different in form.  When we were working on the format for our DCAs at Solo, Raj showed me a model that had been used at Merrill Lynch. I discuss further below the WP2 system used by NCB and other German banks, but the DCAs produced by that system also looked very similar to the one from Merrill Lynch. As well as the Merrill Lynch template we also reviewed different DCAs used by various of our contacts in the London financial markets (such as brokerages) and decided that they all looked more or less the same.

88.    So far as I was concerned the DCA was a communication from Solo to its client, rather than to SKAT, but I knew that the USPFs would include the relevant DCAs in their tax reclaim applications. It was important for the DCAs to be carefully checked, and that was one of my roles throughout my time at Solo. In checking a DCA, I would consult the custody records, looking at the dates of payment and the number of shares in the custody system, as well as the publicly available information on the tax rate. I would check that the tax calculation was correct (using Excel), and that the two unique identifiers for the relevant security (the Sedol and the ISIN) were correct. Basically, I would check everything on the DCA – the whole process would typically take around 10 minutes for one DCA (assuming there were no major errors). I or someone else would sign the DCA before it went out to say that I believed it to be accurate, although I don't believe that a signature was actually necessary.

89.    At Solo, there would be a minimum of a three-person check, at least one of whom would be in operations, which was Adam Forsyth's team in the UK. Then there would be at least two and sometimes three other people doing a further check – me, or Raj or Dipti

Vyas or someone else from legal. Operations did make the odd mistake, but that was not surprising. I have never come across a bank, custodian or prime broker where operations did not make a mistake. That was why it was important to have a further check before a DCA went out. If I spotted what I thought was an error, I would ask Operations to explain, they would go back and check (by looking again at the custody statements and, if necessary, the original trade confirmations), and they would then recirculate the DCA with the corrected data. I (or Raj, or whoever was doing the further checks) would then check again to ensure the DCA was correct before it was signed and sent out.

90.  Any communication with SKAT about withholding tax reclaims was exclusively through the tax reclaim agents, and I would have discussions from time to time with those agents about how reclaims were presented (for example, SKAT's preference for them to be presented in batches rather than piecemeal). So far as I am aware, SKAT never expressed any dissatisfaction with the content of those applications. My conversations with the agents tended to be very practical – for instance, what would be the best time of day for Solo to bring DCAs to the agent's office. Acupay was very close to Solo's office in the City, so we delivered the DCAs by hand, but Goal were in Croydon, and so we had the DCAs couriered with a signed receipt. I was also the person at Solo notified by the reclaim agents when funds had been received from SKAT, and who would liaise as necessary between the agents and the representatives of the USPFs.

91.  I have been shown a tax reclaim application to SKAT by one of our clients, the Sander Gerber Pension Plan, made through Acupay and with a SKAT date stamp of 31 December 2012 (document ID SKSK00281007). The application pack contains various documents, but the only ones which I would have seen at the time (other than the form 6166s, which I discuss below) were the two DCAs dated 3 and 17 December 2012, both of which I signed. Those dates are the dates on which the dividend was credited to the client's account, which was also the payment date of the dividend as per the public record. The DCA also shows the name and address of the client, the relevant security, the two unique identifiers and the number of shares, as well as the gross dividend, the amount of tax and the net dividend, all in Danish kroner.

{CMTKBA/204}

92.  I understand that SKAT's case against me is that a DCA such as this contains statements or representations made by me to SKAT, and that I knew those representations to be

false. I do not accept that I intended to make or considered myself at the time to be making any statements or representations (true or false) to SKAT in this document (or any other DCA), since the DCAs were documents produced by Solo for its clients, not for SKAT. But leaving that aside, I do agree that the DCA did state certain things, and my Legal Team has asked what I understand is meant by the particular words "*this payment represents the dividend shown below*".

93.   What I believed those words to mean is that the client had received a cash dividend which arose on the particular number of shares identified and which the client had purchased in its account, in the gross and net amounts stated. By "*dividend*", I understood a Market Claim which, as I have explained above, I regard as a real dividend. For clarity, I do not consider that by using the word "*dividend*" the DCA was making any statement about whether or not the dividend was traceable to the CSD or to the relevant Danish company. I have never seen a DCA which makes such a distinction between different kinds of dividend, and I do not believe such DCAs exist. DCAs which I have seen (including those produced by Merrill Lynch and by the WP2 system) simply use the word "*dividend*" to cover both. Nor have I ever seen a DCA from which it would have been possible to identify trades that were open as against trades that had settled.

94.   If it had mattered to SKAT (or to anyone else reading this DCA) which kind of dividend it was, then SKAT could have asked and the client could have provided SKAT with further information. I do not believe that SKAT ever did ask questions, which surprised me to some extent, because the reclaims were in quite large volumes, and because there was always the possibility that Denmark would move to restrict cum-ex trading, as was happening elsewhere. I would have expected SKAT to ask about various things – the holding period for the equities, or for evidence from broker confirms that the purchase had been before the ex-date. Had SKAT asked, I was confident that the reclaim would have been fine, because of the advice we had received from HS. Solo or the clients would have provided whatever information SKAT asked for, and I thought SKAT would still have paid the reclaim, because the method of settlement did not affect the tax treatment and – at the time at least – short selling didn't matter because nobody cared about the status of the seller. Of course, had SKAT indicated that it would refuse to pay the reclaim, or if Denmark had moved to restrict or prevent cum-ex trading, Solo would have ceased its involvement.

95.    The DCA also records the number of shares giving rise to the dividend. To the extent that that makes any statement or representation, I considered that it simply means that that number of shares was recorded in the client's individual account at the custodian, and that, in a general sense, the client was the owner of the shares. By 'owner', I did not necessarily mean in a technical sense to do with Danish tax law, but simply as the beneficial owner of the shares, in the sense of being the sole owner of those shares with all of the associated relevant risks and rewards of holding the shares. I certainly did not regard myself, in signing this DCA, as making any sort of statement to SKAT (or anyone else) about the appropriate tax treatment of the dividend or the validity of the reclaim application, since I would not have been qualified to do so. Those were matters as between SKAT and the applicant USPF. I also note that the DCAs say nothing about whether the shares had been acquired via short sales, nor about their traceability to the CSD. I do not regard this as surprising, since I did not believe that these were relevant to the tax treatment.

96.    For completeness, the only other document in the reclaim application pack I would have seen was the form 6166. This was a document produced by the US Internal Revenue Service to do with the client's US tax status. I had no role in producing this document and only saw it because they were sent to me by the clients to bundle up with the DCA to be passed on to the reclaim agents. I would generally read them, because they were very short (one page) documents and I wanted to make sure that the right DCAs were bundled up with the right form 6166s, but I did not check them (and was not qualified to do so) because – unlike the DCAs – they were not documents produced by Solo.

97.    In relation to the reclaims process, my Legal Team has shown me certain documents sent by Acupay to the e-mail address 'reclaims@solo.com' (document IDs SKEL00175026 and SKEL00174931). I can see from those documents that e-mails sent to that address would have been directed to my account (among others). On at least one occasion, Acupay sent a sample completed WHT application to Dipti Vyas of legal (with 'reclaims@solo.com' in copy), asking for Dipti Vyas's comments; she then replied (with 'reclaims@solo.com' still in copy) that she had none. I have no recollection of that chain of emails, and it is not my recollection that Acupay (or any of the other agents) routinely sent completed applications to that address, or to Solo at all, nor that Solo would comment on them. I can only assume that there may have been some particular feature

{MTKC3/296}, {MTKC3/286}

37

of this application that made Acupay do this, but all I can say is that this was not the norm.

**DCAs and the alleged misrepresentations**

98.   I understand from my Legal Team that, in the main trial of these proceedings, the court will be shown the documentation for a number of sample transactions. I also understand that none of the DCAs which I signed (such as the example discussed above) is associated with any of the sample transactions. I cannot therefore be sure whether or not I saw any of the DCAs associated with the sample transactions during my time at Solo, because I may or may not have been one of the Solo team who checked them.

99.   My Legal Team has shown me, however, the DCA associated with the sample transaction known as 'Solo 9', which is dated 27 March 2013 and signed by Jas Bains (document ID

{MTKC25/667}       DWF016058). That DCA is in exactly the same format as the DCAs which I did sign (discussed above) – the language is identical, and it is only the details of the particular shareholding that have changes. Insofar as I regard the 'Solo 9' DCA as making any statements at all, I therefore regard it as making the equivalent statements to those which I explain above.

100.  My Legal Team has also shown me paragraphs 19 and 21 of the most recent version of SKAT's Particulars of Claim (the "**7APoC**"), which set out the representations which I am alleged to have made, known as the WHT Application Representations (7APoC paragraph 19) and the Custodian CAN Representations (7APoC paragraph 21). They have also shown me Responses 3, 4, 5, 7 and 8 of SKAT's Response to RRFI dated 11 August 2023, which attempt to clarify these alleged representations. I have been asked, having refreshed my memory of the contents of the two DCAs discussed above, and on the assumption (which I reject) that I made any sort of statement or representation to SKAT at all, for my observations on these alleged representations.

100.1.   7APoC paragraph 19(a): I do believe that the WHT Applicant was the owner of the shares. By that I mean in the general sense, that at the time of the dividend declaration the USPF had purchased the shares, that those shares were recorded in its individual account at Solo and that no-one else was the owner of the shares.

I did not consider the DCA to be making any statement about 'ownership' for Danish tax purposes – that was a matter for SKAT and the USPF to determine. As a general point, had I been asked at the time, it would have seemed back-to-front to me for the DCA to be making a statement to SKAT about anything to do with Danish tax law – SKAT was the authority on this, not Solo, and so it was up to SKAT to take a view on the appropriate tax treatment of a dividend. But nor did I consider that the method of settlement or the traceability of the shares to a sub-custodian or the CSD was relevant to the general sense of 'ownership' because of the HS advice, and nor did I consider that short selling affected the position.

100.2.   7APoC paragraph 19(b): I regard this allegation as inarticulate and do not believe it makes sense; to me receipt of "*the dividend*" and receipt of "*payments representing the dividends [sic]*" are the same thing; and in any event, because Danish tax law operates on the accruals basis, receipt of the payment is irrelevant. But ignoring that, I do agree that the USPF had received the dividend on the payment date (or that the payment credited to their account was a dividend, if that is any different) – because (absent any rule to the contrary) a Market Claim is a real dividend as I have explained.

100.3.   7APoC paragraph 19(c): I do not agree that the DCA was making a statement or representation that the "*Danish company had withheld the tax described in the [DCA] from that payment*". All the DCA was showing was the calculation that got from the gross dividend to the net dividend. Only the net dividend is ever credited. The DCA was not saying anything about traceability through the custody chain to the Danish company, in the same way it was not saying anything about traceability through the chain to the CSD.  The withheld tax was paid directly by the relevant company to the tax authorities, and this would have no connection (or traceability) to the CSD or to anyone in the chain of custody, at all.  I do not believe that the DCA was misleading in this regard – a Market Claim (whether or not it is traceable) is a dividend just as much as a 'standard' dividend (which may or may not be traceable), and had SKAT regarded the distinction as relevant then they could have asked about it. On this point I have been reminded by my Legal Team of SKAT's legal guide that was in force at

39

the time I was involved with Danish cum-ex trading. This document provides no guidance on the distinction between either a long or a short sale or between a dividend or a dividend payment, and also states that "*A share has been purchased or sold on the date on which a final and binding agreement on purchase or sale is in place*". I was aware of this document at the time (which was available on the internet) and I recall that it confirmed my view that the Danish cum-ex trading would result in valid WHT reclaim applications.

100.4.   7APoC paragraphs 19(d) and 21(d): as set out in the preceding sub-paragraphs, I do not agree with how SKAT characterises "*the statements of fact*" in the WHT Applications or in the DCAs. But leaving that aside, for the reasons explained above, I believed that the USPF had an honest belief that the statements of fact in its reclaim application were true, and I believed that the DCAs were "*an honest and accurate statement of the facts set out therein*". I honestly believed at the time that these were completely valid applications. My view at the time (and now) was that, although some people regarded cum-ex trading as disreputable, and some governments sought to prevent it, unless cum-ex trading was specifically regulated against or prohibited in a particular jurisdiction, it was a legitimate and commercially acceptable activity. I believe this was also the view of the multiple other individuals and entities – including some of the world's largest banks – that participated in or supported this trading before and during my own involvement in cum-ex.

**Financial Arrangements with Sanjay**

101.  Not long after I moved to Dubai, Sanjay and I began to discuss the share of profits that I would be entitled to arising from the trading that was taking place.  I cannot recall precisely when these conversations took place, but during the course of them Sanjay and I agreed that I would be paid in the region of 30% of the profit that Solo earned from the trading that I was involved in. I regarded this proportion as fairly standard, given my role in helping to structure and implement the trading strategy, and I believe it is around the same level that Raj received.

102.  At around this time, Sanjay asked me to enter into a consultancy services agreement with him directly and assured me that he would make payment of monies to me reflecting the above agreement.  I can recall discussing this with Raj, who had a similar agreement with Sanjay.  At this time, I only had an oral agreement with Sanjay, and the prospect of commencing proceedings against him in Dubai (where were both living), did not seem attractive.  Accordingly, I felt that I really had no choice but to put my trust in Sanjay, which I did, the consultancy agreement being dated 20 April 2013.

103.  On 13 June 2013 Sanjay confirmed to me that he would make a payment to me of €5million.  This was before I had left SCDL.  This was less than I was owed per our agreement, and Sanjay agreed with this, but he told me that this was all he was able to pay me at this time, and I was happy to receive at least some payment on this basis.

104.  Sanjay's lack of funds was not a surprise to me – as I have described above, he was always very active in seeking to grow Solo, and its offerings to clients, and this often involved him buying new entities.  Sanjay was also acquiring substantial real estate in a number of different jurisdictions.  I was not involved in this at all, with Sanjay very much acting on his own, but it was not a surprise to me that Sanjay was spending money faster than Solo was earning it.

105.  On the same basis as above, on 15 July 2013 Sanjay agreed to pay me and I agreed to receive a further £4million.  In discussions that took place around September 2013, Sanjay and I agreed that I would be due a further payment of £4.624 million.  However, at this time Sanjay told me that he was facing significant cash flow issues and asked that I loan him £7million to assist with this. Again, it was not a surprise to me that Sanjay only had limited cash available.  I do not know what projects in particular Sanjay needed funds for; as I said, he was active in multiple businesses, including real estate. I do not believe he would have needed the money to support Danish dividend arbitrage trading, however; once Raj and I had left Solo, Sanjay no longer needed to pay our salaries for working on that, and so the running expenses for that activity were greatly reduced. Sanjay offered to pay interest on this loan at 10%.

106.  I can recall discussing the proposed loan arrangements with Raj (to whom Sanjay had made a similar proposal), and we concluded that agreeing to provide Sanjay with the

41

loans he was requesting was the only way we were likely to receive the additional monies that we were entitled to from the relevant trading.  Again, the prospect of instead suing Sanjay in Dubai was not attractive.  Against that, the interest that Sanjay was offering to pay on the loan was an attractive proposition, particularly as a source of income at a time when I was not in employment.  Accordingly, I agreed to provide a loan to Sanjay on the terms suggested, the total loan amount being £11.624million.

107.  The subsequent loans that I agreed to with Sanjay were all for the same reason, and I agreed to enter into them on the same basis.  The details of these are as follows:

107.1.  On 17 February 2014, Sanjay made a payment to me against the first loan of £1.25million.  I do not know whether these funds (or any of the other loan repayments) came from the profits of Danish dividend arbitrage trading; it did not matter to me at the time, and I did not ask.  However, at this time he again told me that he was not in position to make full repayment of this loan, but that he expected to be able to do so in the near future.  Accordingly, after further discussion, on 27 March 2014 Sanjay and I agreed for the sums due under this loan to be reconstituted in a further loan, in the amount of £10.374million. Sanjay then repaid this loan to me, in full, on 6 June 2014.

107.2.  Also in February 2014, in discussions with him, Sanjay and I agreed that I would accept a further payment of £11,150,000 in final settlement of the additional sums that he owed to me from the trading.  Sanjay confirmed this in writing to me on 14 February 2014, and on 21 February 2014 I agreed to loan him this amount.  At this time, Sanjay told me that he would be able to repay this loan to me fairly swiftly, and accordingly we agreed to a lower rate of interest, at 4%. In the event, Sanjay repaid this loan to me in full on 4 July 2014.

108.  I made no secret of these arrangements with Sanjay.  For example, I confirmed them in communications with HSBC relating to the receipt of funds (document ID DWF034496).

{MTKC9/792}

**Oryx and Siladen**

109.  After Sanjay had effectively fired me from Solo, I went on a long holiday across Europe with my family.  This lasted for a few months – I cannot recall precisely until when but I expect it will have been until early September with the children returning to school.

110.  At the end of that vacation, I returned to Dubai with no fixed plans on the next steps in my career.  However, not long after my return, Raj contacted me, and advised me that he had been in discussions with Matt Stein as to the possibility of them (Raj and Matt) continuing to work together, in both the Dividend Arbitrage space and with other trading opportunities generally.  Raj explained to me that Mr Stein and another of the individuals formerly associated with Argre, Mr Jerome L'Hote, had left Argre had started their own company (Maple Point LLC – "**Maple**") and wanted to continue to be able to offer the dividend arbitrage strategy that had been developed at Solo to various US pension funds they were advising.

111.  They were accordingly keen for Raj to provide them with the appropriate know-how as to how trading should be conducted.  I can also recall from conversations with Raj at the time that Maple had advised him that they had substantial funds to deploy to generate profit in various activities (not limited to dividend arbitrage trading) and wanted to work with Raj and associates of his to develop trading strategies to achieve the same.  Finally, they also wanted a German bank which they had an ownership interest in, North Channel Bank ("**NCB**"), to act as a custodian for the purposes of the trading activity, so that it could enjoy the profit generated from such services.  I was aware of NCB from the course of my employment at Solo – towards the end of that employment, there had been a request by Argre that cash held on behalf of certain of the US pension funds be transferred to NCB.  However, I left Solo before these discussions substantially progressed and I am not aware of what became of them.

112.  To achieve Maple's aims, and given my understanding of the technology behind the strategy, Raj was keen for me to work with him.  He also told me that he wanted to recruit others from Solo who had been involved, particularly Mr Anupe Dhorajiwala, who had been head of operations of SCDL and had a good understanding of the necessary infrastructure that needed to be in place for NCB to be able to act as a custodian, as per

Maple's wishes.  Raj also recruited Craig Price, another structurer who had been employed at Solo (but who was not involved in the trading activity that is relevant to proceedings), I understand with the intention of designing alternative trading strategies. The same was the case for Piero Politeo, a friend of Raj's that he also recruited at this time, who I did not previously know.  The recruitment of Craig, Anupe and Piero was all a matter for Raj, and not something that I was concerned with.

113.  The discussions between Raj and Matt Stein as to arrangements between them were just that, and I was not a party to them.  Raj and I had various discussions during this period, and it was not always clear that he and Matt Stein were going to be able to agree terms to work together.  However, eventually they did so, and towards the end of 2013, Raj incorporated an entity in Dubai for the purposes of employing the individuals I have referred to above and providing the consultancy services to Maple and the US Pension funds that Maple would come to introduce.  This was Oryx Management Consultancies ("**Oryx**").

114.  As for myself, at this time I was in Dubai, but for personal reasons, in order to be closer to my family, I decided to move back to the United Kingdom.  Accordingly, rather than becoming an employee of Oryx, I decided to instead enter into a personal consultancy agreement with the company, which was executed on 28 November 2013.  Subsequently, I'm aware that Raj and the others at Oryx incorporated a BVI entity, which it was intended would receive the profit derived from the consultancy services they were going to provide.  This was Siladen Limited ("**Siladen**") and in May 2014, so that I could I enjoy a share of those profits, I agreed to novate my consultancy agreement from Oryx to Siladen.

**NCB**

115.  As noted above, one of Maple's objectives was for NCB to act as a custodian for the services for the relevant trading.  Reflecting this, one of the first things that I did after agreeing to join the project was to send an e-mail to various NCB personnel detailing the IP/technology behind the trades ({B/117.11/17}).  I can see that this e-mail was dated 21 October 2013 and was written to the Bank's senior officers – Volker Bellmann, Stefan Persch, and Uwe Jablonka (the "**NCB Officers**"), as well as Thomas Hornung, whom I

recall the Bank had specifically recruited (I believe from Citibank) to oversee the trading that would follow.  This was the first time that I had written to these individuals, but I provided them with a full account of the technology behind the trading structure that we had developed at Solo, holding nothing back.  I was keen for NCB and the relevant individuals to have a full understanding of each step of the trade, including net settlement to zero in NCB's omnibus account, and the consequences of the same. NCB would be the party actually putting the transactions on their books and so needed to be in a position where they almost had an operating manual for the trading and would be in a position where they could really kick the tyres on it and properly understand the risks.

116.  During this period we met with the NCB officers on a number of occasions.  I can see from the e-mail disclosure (document ID SKSK00222423) that this included a meeting with them in Mainz on 22 October 2014, whilst I can recall meeting them again on later occasions.  The NCB Officers were fiercely independent, and despite Maple's ownership interest and eagerness for NCB to act as a custodian for the trading, the decision to do so was very much made by the NCB Officers.

{CMTKBB/166}

117.  During the course of the meetings that I attended with them, they asked numerous questions as to the relevant trades and technology (including about the settlement process), and both I and the others that I had travelled with (Anupe and Raj) were very happy to answer those questions.  The NCB Officers also asked a number of questions relating to the trades and technology by e-mail, which again we were happy to address, in full.

118.  On one of the occasions that we travelled to Germany I can recall that we also met Martin Krause, of the Frankfurt office of the law firm Norton Rose, and discussed various elements of the trading with him. I recall in particular that we discussed net settlement in the omnibus account with him, and he reassured us that it happened extensively in the German market and was regarded as acceptable. I have been shown by my Legal Team a copy of Norton Rose's advice on this point to one of the shareholders of NCB, Oban Holdings LLC, dated 14 February 2014.  I am not aware whether privilege over this advice has been waived, but I recall seeing this document at the time and being reassured that it supported the legitimacy of this aspect of the trading.

119. As part of this introductory process, I provided the NCB Officers with a sample Credit Advice Note. This simply reflected knowledge of the process that we had gathered during the course of our employment with Solo – e.g. that this document was in a form that SKAT had confirmed that it would accept as part of its processes in considering withholding tax reclaim applications. NCB had some queries for us on the Credit Advice Note, which we answered, but in the end the NCB Officers resolved that they would not use the precedent Credit Advice Note, and instead signed up to use the WP2 system, which is an off-the-shelf securities reporting, accounting and settlement system operated by DWP Bank in Germany, and which is used by a very large number of banks in Germany. On one of our trips to Frankfurt/Mainz, Anupe and I attended a day's training session on the use of the WP2 system – it is very prescriptive in terms of the trading data that is entered, and produces documents for a bank's end clients on the basis of the data that is input. This is a system that cannot be manipulated. It produces its own form of credit advice note confirming the payment of a dividend, which would be provided to the custodian in hard-copy. Only a single Credit Advice Note is produced and a second copy cannot be obtained.

120. I was aware from discussions with the NCB Officers that, almost immediately upon becoming aware of the IP/technology of the proposed trades, NCB began to take its own independent legal advice in relation to what was being proposed. I am aware, again from discussions at the time, that Maple had taken advice, which it would likely have shared with NCB because they were shareholders in NCB. NCB also obtained its own independent advice – possibly from the German office of the US firm Jones Day – as well as Danish tax advice from Bech-Bruun. None of that advice was shared with me, but again, given my experience of them, I am certain had it contained anything that was of significant concern, the NCB Officers would have not permitted NCB to be involved in the trading. That they did suggests to me they had received advice that was of comfort to them.

121. Once NCB had put in place the necessary arrangements to allow it to act as a custodian, including its use of the WP2 system, NCB conducted a test trade based on the IP we had provided them with. From material provided in the disclosure (document ID SKSK00497623), I can see that this involved one of the USPFs that had been introduced by Maple acquiring a small number of shares in the German company Daimler and

46

==following the series of the trades that formed the trading structure.==  NCB booked this trade through the WP2 system. Although I was not personally involved in this test trade, it is my understanding that this resulted in the WP2 system producing a credit advice note, in precisely the same form that it ultimately produced once the USPFs were engaged in the actual trading that these proceedings relate to.  I say this because I believe that, if that test trade had not resulted in the WP2 producing a credit advice note, I do not believe that NCB/the NCB Officers would have been willing to continue to be involved in the trading.

122.   By the time the USPFs began actually trading during the course of 2014, the NCB Officers had a good understanding of the technology of the trading, and the actions that NCB should take as a custodian in processing the same.  Accordingly, they conducted this activity with very little reference to me, or others at Oryx/Siladen at all.  I did not have any involvement in the trading (beyond occasionally asking participants for documentation on NCB's behalf), or in the recording of the same in NCB's systems. NCB kept this very much to itself. NCB's role in the trading was equivalent to Solo's custodian role during my time there: Maple Point had introduced the USPFs to NCB, we had introduced NCB to the other participants, and NCB did the rest. Having reviewed the NCB Trade Samples, I have recalled that, in its implementation of the technology/IP behind the trading, NCB insisted on various loan arrangements between the trade date and the settlement date.  This was not something I was involved in, and I do not regard it as particularly important to the trading.

123.   Nor did I have any involvement in the production of the credit advice notes that flowed from these trades, as above these being produced by the WP2 system.  The only real involvement I had was that, once the credit advice notes were produced, NCB sent them to me (as below, at Indigo's office in London), and I arranged for them to be sent to the relevant tax agents to be used for reclaim applications.  This was purely a matter of convenience – Indigo's offices were close to the tax agents in London, and it was more efficient for the relevant advices to be provided in batch rather in piecemeal fashion.

**Indigo Securities Limited ("Indigo")**

124.   From my conversations with Raj when he first contacted me, I was aware that Maple wanted there to be two custodians which the US pension funds could use as a custodian for the purpose of the trading.  I considered that this was sensible, to reflect the number of the pension funds that wished to engage in the trading, as well as from a risk management perspective. The trading periods tended to be quite compressed, since the trading had to take place around the Danish dividend season, and so there was a lot of work for one custodian to do in a short time. We also discussed that Oryx would assist Indigo Securities Limited (**"Indigo"**), a company owned by Anupe's brother in law, Mr Nailesh Teraiya  (who I know as and refer to as "**Nailesh**") in obtaining permissions to act as a custodian for the purposes of the trading.  I am quite sure that, before this, I had met Nailesh previously in Dubai, but I cannot now recall whether I knew of Indigo.

125.   As part of this process, I, together with Raj and Anupe, held various conversations with Nailesh as to the technology of the trading.  Again, this was on a completely open basis, with nothing held back, and responding to various queries that Nailesh raised in relation to it. Nailesh was already familiar with the conduct of the trading itself, having been involved during my time at Solo, but he needed assistance understanding the custody aspect, which was not something he had engaged in. Again, as far as I'm aware, it was wholly Nailesh's decision that Indigo become involved in the trading.  There were also meetings with Bovill – consultants that had been retained by Indigo to assist in obtaining the necessary permissions – I can see from the disclosure (see e.g. document ID
{MTKC11/12}      INDIGO0022215) that I met with Bovill on 19 February 2014, and that subsequently (see
{MTKC11/298}     e.g. document ID INDIGO0022376) I asked various questions of Bovill relating to Indigo's dealings with its clients.

126.   As noted above, when I moved to Dubai I had hoped that my family would come with me, but they had in fact stayed in England.  In late 2013/2014, I had been considering returning to England to be with my family, and ultimately I decided to do so.  By the time that I had made that decision, it had been agreed that Indigo would act as a custodian for the purposes of the trading (with Global Prime Partners acting as sub-custodian), and I agreed with Raj and Nailesh that, on my return, I would be appointed as a director of Indigo.  This was again really little more than a matter of convenience – essentially to

48

ensure that I had a desk in London to be able to continue to provide my consultancy services to Oryx, and to be able to assist Nailesh with the management of Indigo's custodian business.  From my employment with Solo I had seen the day-to-day work that that a custodian had to undertake, and I was happy to deploy this knowledge for the benefit of Indigo and Indigo's clients.  This is precisely the role that I undertook during the course of employment with the company.  My contract of employment with Indigo was signed on 28 April 2014, and on 30 April 2014 I obtained FCA approval – both CF1 (to act as a director) and CF30 relating to customer dealings.

127.   In fact, trading by the relevant US Pension Funds using Indigo as a custodian had started before I joined the company. That meant that I had no input into structuring the trades; the model followed that used at Solo. Once I joined, my role was similar to that which I undertook at Solo.  I was not a trader and was not involved in any of the trading itself, beyond what I describe below.  Again there would have been discussions as to the volume of trading that the US Pension Funds wished to undertake on the long side, and the division in terms of volume of the trades between the various other participants on the short side (some of whom had also been involved in the Solo trading). I had more involvement in these discussions at Indigo than I did at Solo (where Sanjay took the lead), but my role was still limited.  I may also have had some discussions with some of the participants at the time that they were first onboarded with Indigo and NCB (though I had no involvement in their actual onboarding by NCB).  Nor was I involved in the back-office function of recording the trades in Indigo's books etc.  Rather, my role remained supervisory and at a second level of checking.  I also frequently liaised with Maple to keep them appraised of the status of reclaim applications, and was in contact with the reclaim agents to enquire about the same. These dealings with all of these participants were typically over the telephone rather than by email. As noted above, the credit advices produced by WP2 the system for NCB were sent to me at Indigo for onward transmission to the agents, which was purely a matter of convenience.

128.   The technology of the trading itself in 2014 was identical to the trading which took place at Solo, with one exception – the USPF hedged its long exposure to the price movement from the purchase of its shares by a forward contract rather than a listed futures contract. There was no economic difference in this change to the technology, and the change was for convenience – a forward being cheaper than a future. The fact that a forward was

traded OTC and a future on an exchange made no difference to the visibility of the trading: it would not have been likely for a futures exchange to care whether futures trading was in support of dividend arbitrage activity, and there were in any case reporting requirements for the equities trading to the London Stock Exchange via UnaVista.

**2014 – Remuneration**

129. As discussed above, I had agreed with Raj that I would be a consultant to Oryx, who in turn would be a consultant to the US Pension Funds. As far as being paid was concerned, our agreement was that I would be paid a fair share of the profits that was generated, which we would agree between us. I trusted Raj about this and was comfortable that we would have grown-up and sensible discussions to agree the same.

130. In the event, these discussions took place-towards the end of 2014, and it was agreed that I would be paid a total of £8,197,000 (my Legal team having shown me a Siladen board {MTKB1/680} resolution confirming the same at document ID DWF025613). I subsequently issued 5 invoices to Siladen covering different time periods of the services that I provided, which was convenient to me for tax purposes.

131. Subsequently in discussions with the others it was suggested that I had been overpaid for the services I had provided. I did not fully agree with this, but again did not mind having sensible adult conversations about it, and I agreed to return £1,093,000 to Siladen (a {MTKB2/113} Siladen board resolution confirming the same being at document ID DWF025612). This was arranged for in February 2015.

**Wind-down of 2014 Arrangements**

132. Towards the end of 2014 Anupe, Raj and Nailesh told me that they did not want to continue being involved in dividend arbitrage. This was not a surprise to me – I had been slightly surprised that Raj chose to become re-involved at all after he left Solo in 2013, because he seemed tired of it and bored with the work and wanted a change; and I knew that he had always been keen to focus on his wildlife photography. So it was of no particular concern to me that he wanted to move on and not be involved any longer. Nor

was I concerned that Anupe and Nailesh wanted to move on and become involved in other things.  Nailesh also wanted to wind down Indigo and move to Dubai.

133.  Once Raj (and Anupe) decided to cease involvement in the dividend arbitrage activity, I ceased providing consulting services to Siladen.  However, Raj, Anupe and I at the others at Oryx (Craig and Piero) remained in contact and we often shared investment opportunities.  However, this was very much on an individual basis – e.g. sometimes, when I became aware of what I thought was a good investment opportunity, I would share this with the others so that they had the opportunity to invest.  However, whether or not to invest was very much a matter for each individual – there was no obligation to do so.  I'm aware that Raj and Anupe also pursued some opportunities together, which I was not involved in.

**Gold Eagle Securities Limited ("GESL")**

134.  Nailesh's decision to wind down Indigo meant that we had to find another entity to act as a custodian for the purpose of the trading (as per paragraph 124 above, it had always been the intention that there be two custodians for this purpose).  I felt that I had sufficient knowledge and expertise to be able to operate a custodian, and so in early 2015 I arranged for the incorporation of a company for this purpose – being Gold Eagle Securities Limited ("**GESL**").  This was alongside GMH Advisory LLP, which I refer to below.

135.  During the course of 2015 I engaged with the FCA for GESL to obtain approval to act as a custodian.  At this time, I also recruited Natassia Kourousi, who had been Indigo's compliance officer, as a compliance officer for GESL (and as below, GMH Advisory LLP), and she assisted in the progression of this application.  I deal with this further below.  In August 2015 the FCA approved GESL to act as a custodian, but it in fact never operated.

**GMH Advisory LLP ("GMH")**

136.  Alongside GESL, I also set up another entity in England, which was GMH.  This was the vehicle through which I intended to continue to provide my consultancy services.

137. By this time I had two colleagues working with me – Aryeh Rowe, and Gelara Avak. I had met them whilst they were employed by a tax agent I had dealt with during the course of my employment with Indigo (Syntax) and was impressed with them. Accordingly, I had recruited them to assist me with the services that I was providing to the US Pension Funds, at both GESL and the provision of custodian services and in the form of the consultancy services that I was providing. I made Aryeh and Gelara members of GMH in order that they could share the profits arising from these services.

138. As with GESL, I engaged in discussions with the FCA to obtain suitable approvals for GMH. In fact, I did not consider that the consulting services GMH was providing were a regulated activity, and accordingly that it was not in fact necessary to obtain any approvals from the FCA, but nevertheless I thought it prudent for GMH to obtain such approval. During the course of 2015, GESL's (which I refer to above) and GMH's applications for FCA approval were effectively consolidated, and managed by Natassia. {MTKB3/943} I can see from the disclosure (document ID DWF021578) that I met with the FCA on 14 July 2015 to discuss both applications (e.g. GMH and GESL).

139. Throughout the course of these applications, in various queries raised by the FCA, and at my meeting with them, it was made clear that GMH intended to provide advice to entities engaged in dividend arbitrage trading, and that GESL would act as a custodian for the purpose of such trading. The basics of a typical trade by one of GESL's clients were set out in a document entitled "Trade Flow" that was sent to the FCA (document ID {MTKB3/708} DWF026118 – confirmation of it having been sent to the FCA by Natassia Kourousi in {MTKB3/706} document ID DWF026116). This was in response to a specific questions about trading process by the FCA, and is about controls over trade approvals and operational processes. Having discussed arbitrage trading with the FCA at our meeting on 14 July 2015, and in response to their queries, I then prepared an illustrative example of a typical dividend arbitrage trading for Natassia to send to them, which was sent by Natassia to the FCA on {MTKB3/945} 15 July 2015 (document ID TBC). That GMH and GESL's proposed clients intended to {MTKB3/954} engage in dividend arbitrage trading did not appear to be of any particular concern to the FCA, whose primary concern appeared to be whether the companies would generate sufficient profit. In the event GMH obtained FCA approval a few weeks before GESL.

**Lindisfarne Partners ("Lindisfarne")**

140. At the beginning of 2015, Craig had also introduced me to another English company, who could potentially act as custodian, Lindisfarne Partners ("**Lindisfarne**"). I recall that Craig had previously worked at Lindisfarne, and that, although Lindisfarne had the necessary regulatory permissions to operate a custody business, it was not actually doing so. When I was introduced, Lindisfarne was managed by Paul Baker and Arthur Hogarth (who I know as and refer to as "**Paul**" and "**Arthur**" respectively). Paul and Arthur both had impressive career backgrounds spanning several decades - I can recall that Arthur had previously headed up a desk at (I believe) Goldman Sachs relating to Credit Trading, whilst Paul had significant administrative experience.

141. I can recall that Paul and Arthur introduced me to a couple of other custodians, but I do not recall those meetings in any detail. In any event, Lindisfarne was a good option and so it was not necessary to take discussions with these firms further.

142. At this time, I met with Paul and Arthur, and had various conversations and e-mail exchanges with them relating to the technology of the trading. Again, this was very much on an open basis, with nothing held back, and I was keen to ensure that they understood it in full. I also sent them various documents, including a sample custody agreement, e-mail confirmations of the trades, and Indigo's price list. All of this was with a view to ensuring a smooth transition from Indigo to Lindisfarne. Given that Lindisfarne would be providing the same services as Indigo to the US pension funds, there was little sense in reinventing the wheel, and I felt it was useful for Lindisfarne to know what prices Indigo had charged for its services (in the event, I recall that Lindisfarne did actually slightly increase the fees that it charged for services).

{MTKB1/902}  143. I can see from the disclosure (e.g. document ID Lindis000285) that there were some e-mail exchanges between Paul and me around this time that show that Paul could be quite assertive in probing the proposed trading strategy. I was happy for Paul to write to me in these terms and am glad that he felt able to do so. As with the NCB Officers, and as with Nailesh at Indigo, the decision to become involved in the trading was one for Lindisfarne, for Paul and Arthur, and it was right for them to explore all of their concerns before doing so. They had questions about pretty much every aspect of the trading strategy and I was

happy to answer them. I don't specifically recall whether they asked about whether we had any legal opinions to support the trading, but they may have done.

144. The trading that took place by the US pension funds that used Lindisfarne as a custodian used the same technology as those that used Indigo as a custodian. As above, that was the same as the technology used by US pensions funds that had used Solo as a custodian, with the exception of using a forward rather than a future. There was one other difference in 2015, which was the settlement terms for the shares changed from T+4 to T+3. This change reflected a change in the standard settlement terms for on-exchange trades, from T+3 to T+2. My role was also similar to that at Indigo, although, now that Raj and Anupe were no longer involved, I would have had more of a conversation with the market participants when they first onboarded with Lindisfarne, and as to the division among them of the trading that the US Pension Funds wished to undertake. These other participants were largely the same as those I had encountered at Solo and at Indigo, although some of the short sellers were new, such as the entities associated with Adnan Haider (whom I discuss further below). However, I was not directly involved in the trading, nor in the back-office work to record the relevant trades, but rather more of a supervisory role, and liaising between Maple and the tax agents relating to the progression of reclaim applications.

145. At GMH, Aryeh, Gelara and I also dealt with various routine queries that came from Lindisfarne, but this was only at a minimal level of support and I considered this to fall firmly within the consultancy services that were being provided to the US pension funds. Though Lindisfarne had its own compliance officer, from time-to-time Natassia also offered compliance support. GESL also offered a small service to Lindisfarne in that GESL had access to a sanctions database which allowed it to undertake AML checks at file opening stage which Lindisfarne did not have access to. Accordingly, it was agreed that GESL would undertake such searches for Lindisfarne and invoice for the same.

**KOI Associates ("KOI")**

146. As I noted above, throughout the course of our involvement in the trading post 2013, I was concerned by Sanjay's efforts to restrict our involvement. This was particularly true of the tax agents – as above he had successfully stopped Acupay from working with our

clients.  I was aware that in 2014 various Acupay employees had left and start their own tax agency, Syntax, but not long after it had been incorporated Sanjay acquired it himself and it too ceased working with our clients.

147.  Given Sanjay's efforts, I was always nervous about only being able to rely on one tax agent.  At around this time I was aware of Alba Brown, who used to work at Acupay, and had substantial experience of the tax reclaims process.  Alba was very happy to set up her own tax agency, and I agreed that I would lend her a small amount of money (£30,000) to do so.  This led to the establishment of Koi, which acted as a reclaims agent for various of the pension funds in 2015.  Alba repaid the monies I had lent her, together with interest, quite quickly, and Koi was able to continue to enjoy a good profit from the services that it provided to the US pension funds.

**DCA from NCB and the alleged misrepresentations**

148.  My Legal Team has shown me a further application for a reclaim of withholding tax, this time dated 19 May 2015, which I understand is also associated with one of the sample transactions that will be used in the Main Trial – in this case 'NCB 2'. Again, the only documents which I would have seen at the time were the DCA itself and the form 6166s, which would have been sent to me directly by the US pension funds to be submitted along with the matching DCAs to the reclaim agents.  But, as per paragraphs 119 to 121 above, by contrast to the DCAs used at Solo, this DCA had been automatically produced by the German WP2 system used by NCB. There were some minor differences in format from the earlier DCAs (such as the conversion of sums from Danish kroner into Euros). There are also some significant differences: the NCB DCA contained an express statement that it was not a tax certificate. Because it was automatically generated by WP2, I could not have corrected it had I spotted any errors, as I did with Solo DCAs. And I am even more certain that this DCA does not contain any statements or representations by me to SKAT, because it is not my document – it was produced by DWP Bank for NCB.

149.  Leaving aside those differences, my evidence on this document (which I did not sign) is essentially the same as it was on the earlier two DCAs. I do not consider that the reference to "*dividend income*" contains any statement about precisely what kind of dividend it is – it could be a Market Claim or a dividend that was traceable to the CSD, but in the view

of the WP2 system (and in my view) both of those are dividends. The point is that the user does not tell the WP2 system whether or not something is a dividend – the WP2 system tells the user based on the details of the trades input into the system (and, as I explain in paragraph 119 above, the user is unable to manipulate the system). If the information input by the user does not indicate the receipt of a dividend, the WP2 system will not generate a DCA. NCB were very keen to use the WP2 system, and, as above, had that system not generated DCAs from the trading that stated that a dividend had been received (and so could be used for a valid application to reclaim withholding tax), I do not believe that NCB would have gone ahead with the trading.

150. I have been asked whether I consider that the references in the WP2 DCA to "*holding(s)*" of shares has any significance. While repeating the point that this wording in a standard-form, automatically generated document is not my wording, I do not believe that it makes any difference. The DCA accurately states the position, as I understood it, for the custody of shares by a German custodian. As far as I was concerned, the shares in question were held from the point at which they were purchased in the relevant client's individual custody account at NCB. As page 2 of the DCA states: "*All holdings credited to the securities account for value [on] the record date are entitled to a share in the earnings to be distributed*". That is entirely consistent with my belief that the USPFs were entitled to receive a dividend.

151. For those reasons (and for the reasons explained in paragraph 100 above), my responses to the allegations in paragraphs 19 and 21 of the 7APoC are the same in respect of this NCB 2 DCA as they were for the earlier two DCAs. To the extent that the NCB 2 DCA contained any statements or representations, they were correct, and I believed (and still believe) that the associated application for a reclaim of withholding tax was valid and made in good faith.

**Adnan Haider and Worldwide Asset Management Limited ("WWAM")**

152. At the beginning of 2015 (I cannot recall precisely when), Craig also introduced me to Mr Adnan Haider (who I know as and refer to as "**Adnan**"). Adnan was a former senior Bank officer of a major local UAE Bank (many of which have a similar name, but I believe Abu Dhabi Commercial Bank). Adnan had a good understanding of Dividend

Arbitrage trading, and he was interested in the opportunity to continue providing consulting services to the US Pension Funds. The company he generally acted through was WWAM, though he had other companies (White Rock DMCC and Lannister Limited), which were willing to act as short-sellers for the purpose of the trading.

153. At this time, I could have acted as a consultant to the US Pension Fund myself or through GMH, but in discussions with Adnan it was agreed that WWAM would act as the consultant to the US Pension Funds, and GMH would act as a consultant to WWAM. This was agreed as part of wider discussions relating to WWAM, which was that it would be a vehicle to invest in a number of opportunities and generate further profits to be shared between us, and I was content for the arrangements to be entered into on this basis.

154. As had occurred with Oryx, at the beginning of 2015 I agreed with Adnan that we would discuss a suitable profit share from the consultancy services at a later stage. From the document itself, I can see that I personally entered into a consultancy agreement with WWAM on 27 September 2015 – this had been discussed and agreed for some time but had been delayed in execution. On 13 October 2015 it was arranged that this consultancy agreement would be transferred to GMH. This was so that the profits from the services could be shared with Aryeh and Gelara as per paragraph 137 above. In the event, it was agreed that GMH would be paid a total of €12,492,000 from the trading, and this was invoiced for and paid during the course of October and November 2015. I believe that the sums due to WWAM represented around 40% of the total profits, which I regarded as market-standard. I drew partnership profits of approximately £6.4 million after deduction of expenses and profit shares to the other partners. At this time, it was intended that the monies retained by WWAM would be reinvested for further profit, but this was effectively stopped by the onset of these proceedings.

155. During the period that I was working with Adnan and WWAM, Adnan made the decision to put the company into a trust structure. This was a decision that he made for his own personal family reasons – I believe as part of estate planning perhaps connected to the application of sharia law in the UAE. I had no involvement in this process, but Adnan told me that, in doing so, he had instructed that I would be a beneficiary of the trust, entitled to a receive a maximum benefit of up to £500,000. I understood that this was simply a means by which Adnan was intent on paying some of the monies that I was to

receive. In any event, I understand that Adnan subsequently dissolved the trust and restored WWAM to his own ownership. I did not receive any monies from the trust.

## 2015 Onwards

156. At the end of 2015, SKAT made a public announcement that it had become aware of a potential fraud and would cease paying out reclaim applications, whilst there was also a various news articles at around this time relating to investigations into Solo. Although (as I have explained above) I honestly believed that the transactions I was involved with were genuine and the reclaim applicants valid, this was of course a matter of significant concern to me. I have been shown emails from late 2015 from tax agents concerning requests from SKAT for information from the USPF (e.g., document ID GOAL00014796). I recall that I did contact the USPFs to see whether they wanted me to help, but they did not.

157. Additionally, at around this period I was going through very difficult personal circumstances – my relationship with my wife was rapidly deteriorating, and it became clear that we would be getting divorced. I was very determined that this would be civil, as any difficulties between my wife and I would only harm my relationship with my children, which I was keen to preserve. Accordingly, at this time I decided to move back to Dubai. Because I would no longer be resident in the UK, I could not keep GMH and GESL (for which I in any case had no need once it became impossible to continue with dividend arbitrage trading), and I decided to dissolve them. Having seen reference to it {MTKB4/708} in the disclosure (document ID DWF026562), I can recall that Natassia had suggesting not closing down GESL for a while or selling it, but I did not think this was realistic – I had no intention of maintaining GESL from Dubai, and I did not think that anybody would be interested in buying it. I believe that in the event of a sale, any purchaser would have to start again with FCA approval, so they might as well start from scratch with their own company.

158. Being named as a Defendant in these proceedings, and indicted in related criminal proceedings in Denmark has had a very significant impact on me – this always comes up during the course of due diligence checks etc, and has meant that it has been virtually impossible for me to gain employment. Given these due diligence checks, a number of

banks have also ceased providing services to me, and simply managing my assets has been very difficult.

## STATEMENT OF TRUTH

I believe that the facts stated in this Witness Statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth

I understand that the purpose of this witness statement is to set out matters of fact of which I have personal knowledge.

I understand that it is not my function to argue the case, either generally or on particular points, or to take the court through the documents in the case.

This witness statement sets out only my personal knowledge and recollection, in my own words.

On points that I understand to be important in the case, I have stated honestly (a) how well I recall matters and (b) whether my memory has been refreshed by considering documents, if so how and when.

I have not been asked or encouraged by anyone to include in this statement anything that is not my own account, to the best of my ability and recollection, of events I witnessed or matters of which I have personal knowledge.

Signed: …………………………………………

Name:   GRAHAM   HORN

Dated:   27   OCTOBER 2023

59

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1. I am the relevant legal representative within the meaning of Practice Direction 57AC.

2. I am satisfied that the purpose and proper content of trial witness statements, and proper practice in relation to their preparation, including the witness confirmation required by paragraph 4.1 of Practice Direction 57AC, have been discussed with and explained to Graham McKenzie horn

3. I believe this trial witness statement complies with Practice Direction 57AC and paragraphs 18.1 and 18.2 of Practice Direction 32, and that it has been prepared in accordance with the Statement of Best Practice contained in the Appendix to Practice Direction 57AC.

Signed:        *Joshua Fineman*

Name:          Joshua Fineman

Position:      Partner, DWF Law LLP

Date           27 October 2023

**GRAHAM HORN**
**APPENDIX 1**
**LIST OF DOCUMENTS THE WITNESS HAS REFERRED TO OR BEEN**
**REFERRED TO FOR THE PURPOSE OF PROVIDING THE EVIDENCE SET OUT**
**IN THIS WITNESS STATEMENT**

| | Date | Reference | Description |
|---|---|---|---|
| {MTKC1/104} | 03/05/2010 | DWF016723 | Graham Horn Contract of Employment |
| {MTKC1/116} | 09/07/2010 | SKEL00155596 | E-mail from Sanjay Shah to various – Call Report – Citigroup – 9 July |
| {MTKC1/333} | 05/07/2011 | SKEL00096763 | E-mail from Sanjay Shah to Graham Horn Fw: Notification of Termination – Ezra Academy |
| {MTKC1/416} | 10/11/2011 | SKEL00157796 | E-mail from Sanjay Shah to Graham Horn FW: Freshfields mail |
| {CMTKBA/774} | [Undated] | SKSK00569362 | Frehsfields Bruckhaus Deringer Draft Opinion |
| {MTKC1/447} | 10/01/2012 | SKEL00995483 | Board minutes of Solo Capital Limited dated 8 December 2011 |
| {MTKC1/492} | 06/01/2012 | SKEL00158654 | E-mail exchange between Graham Horn and Geraldine M Davies of JP Morgan Re: JPM – NQI v QI tax status to be confirmed |
| {MTKC1/650} | 07/02/2012 | SKEL00995771 | E-mail from Graham Horn to Martin Smith Re: Clearing agreement |
| {MTKC1/515} | 10/01/2012 | SKEL00158766 | E-mail from Raj Shah to Iain Lorriman Re: Additional business Plan |
| {MTKC1/587} | 25/01/2012 | DWF000111 | E-mail exchange between Adam Forsyth, Graham Horn and others re JPM fo |
| {MTKC1/611} | 02/02/2012 | BARAC00020992 | E-mail from Sanjay Shah to various Re: box trade |
| {MTKC1/709} | 17/02/2012 | SKEL00160749 | E-mail from Sanjay Shah to Richard Markowitz and others Re: German News |
| {MTKC1/758} | 24/02/2012 | BARAC00028436 | E-mail from Graham Horn to Sanjay Shah and Edo Barac Re: Newedge side-letter |

|  | Date | Reference | Description |
|---|---|---|---|
| {MTKC1/864} | 09/03/2012 | SKEL00161490 | E-mail from John Forman to Edo Barac Re: Countries |
| {MTKC1/895} | 13/03/2012 | SKEL000917135 | E-mail from Sanjay Shah to Anupe Dwala re Potential trade for futures clearing clients: |
| {MTKC1/899} | 13/03/2012 | SKEL00097136 | E-mail from Graham Horn to Gavin M re: US Pension Scheme |
| {MTKC1/905} | 13/03/2012 | BARAC00030945 | E-mail from Graham Horn to Sanjay Shah Fw: Client alert: Belgian WHT exemption for Pension Funds – more stringent approach expected |
| {MTKC1/917} | 14/03/2012 | SKEL00161872 | E-mail from Edo Barac to John Forman Fw: Countries |
| {MTKC1/924} | 15/03/2012 | DWF001269 | E-mail from Sanjay Shah to Raj Shah and Anupe Dwala Re: Plan B – Sensible approach? |
| {MTKC2/125} | 10/04/2012 | SKEL00163009 | E-mail from Barbora Simkova to various re Compliance Meeting Minutes 5 April 2012 |
| {MTKC2/124} | 10/04/2012 | BARAC00020980 | E-mail from Sanjay Shah to various Re: JPM on Thursday |
| {MTKC2/127} | 11/04/2012 | SKEL00163025 | E-mail from Sanjay Shah to various re: Transaction |
| {CMTKBA/768} | 17/04/2012 | SKSK00544117 | E-mail from Graham Horn to Richard Markowitz FW: Belgian Tax |
| {MTKC2/272} | 17/04/2012 | DWF002569 | E-mail from Nilesh Lakhiani to Nilesh Lakhiani re: Dividend Credit Advice |
| {MTKC2/227} | 18/04/2012 | SKEL00163942 | E-mail from Raj Shah to various Re: Contact on Wed and Question on Custody Docs |
| {MTKC2/248} | 18/04/2012 | SKEL00164184 | E-mail from Sanjay Shah to Various re: Call on Thursday |
| {MTKC/243} | 18/04/2012 | SKEL00164180 | E-mail from Stef Lambersy to various RE: BELGIUM |
| {CMTKBA/745} | 03/05/2012 | SKSK00534234 | E-mail from Raj Shah to Various Re: call with Martin Krause |

| | Date | Reference | Description |
|---|---|---|---|
| {MTKC2/416} | 09/05/2012 | SKEL00166366 | E-mail from Jas Bain to Various Re: Monthly Committee Meeting Minutes |
| {MTKC2/541} | 09/05/2012 | SKEL0097778 | E-mail from Raj Shah to Graham Horn FW: Danish tax advisors |
| {MTKC23/810} | 23/05/2012 | SSHA00011911 | E-mail from Graham Horn to Nikolaj Bjornholm FW: Danish Listed Shares Transaction |
| {MTKC2/624} | 29/05/2012 | SSHA00011975 | E-mail from Nikolaj Bjornholm to Graham Horn RE: Danish Listed Shares Transaction |
| {MTCK2/662} | 04/06/2012 | SKEL00097907 | E-mail from Raj Shah to Various RE: List of Changes |
| {MTKC23/792} | 13/06/2012 | SSHA00011880 | E-mail from Anne Becker-Christensen to Graham Horn RE: Revised draft Tax Opinion – Danish listed equities |
| {MTKC23/795} | 20/06/2012 | SSHA00011884 | E-mail from Anne Becker-Christensen to Graham Horn RE: Revised draft Tax Opinion – Danish listed equities |
| {MTKC23/798} | 20/06/2012 | SSHA00011887 | E-mail from Graham Horn to Rah Shah RE: Danish Listed Equities |
| {MTKC2/857} | 20/06/2012 | SKEL00098063 | E-mail from Jonathan Sturman to Raj Shah RE: |
| {MTKC2/885} | 21/06/2012 | SKEL00170510 | E-mail from Graham Horn to Various RE: |
| {MTKC2/864} | 22/06/2012 | SKEL00098067 | E-mail from Raj Shah to Graham Horn RE: |
| {MTKC23/799} | 25/06/2012 | SSHA00011891 | E-mail from Raj Shah to Graham Horn Re: Danish Listed Equities |
| {MTKC2/869} | 25/06/2012 (07:36) | SKEL00170367 | E-mail from Raj Shah to Edo Barac and Sanjay Shah Re: |
| {MTKC23/802} | 25/06/2012 (11:22) | SSHA00011897 | E-mail from Graham Horn to Ann Becker-Christensen RE: Revised tax opinion – Danish listed equities |

| | Date | Reference | Description |
|---|---|---|---|
| {MTKC23/803} | 25/06/2012 (14:41) | SSHA00011899 | E-mail from Anne Becker-Christensen to Graham Horn Re: Revised draft Tax Opinion – Danish listed equities |
| {MTKC23/805} | 26/06/2012 (08:19) | SSHA00011901 | E-mail from Rah Shah to Anne Becker-Christen Re: Revised draft Tax Opinion – Danish listed equities |
| {MTKC23/807} | 26/06/2012 (08:24) | SSHA00011903 | E-mail from Graham Horn to Ann Becker-Christensen RE: Revised tax opinion – Danish listed equities |
| {MTKC2/906} | 26/06/2012 (08:52) | SKEL00956267 | E-mail from Adam Forsyth to Various Re: Bloomberg Dummy Account / NBAD Test Trades |
| {MTKC23/808} | 26/06/2012 (14:28) | SSHA00011905 | E-mail from Anne Becker-Christensen to Graham Horn and Raj Shah re: Revised draft Tax Opinion – Danish listed equities |
| {MTKC2/903} | 26/06/2012 | SSHA00011907 | E-mail from Graham Horn to Raj Shah FW: Revised tax opinion – Danish listed equities |
| {MTKC2/918} | 26/06/2012 (15:45) | SKEL00170617 | E-mail from Raj Shah to Sanjay Shah RE: |
| {MTKC2/934} | 27/06/2012 | SKEL00997451 | E-mail from Raj Shah to Matthew Stein RE: Denmark |
| {CMTKBA/204} | 31/12/2012 | SKSK00281007 | Letter from Acupay to SKAT, together with enclsoures |
| {MTKC8/641} | 01/07/2013 | SSHA00011966 | E-mail from Anne becker-Christen to Jessica Hammers RE: Request for Call |
| {MTKC2/986} | 02/07/2012 | SKEL00003674 | E-mail from Rah Shah to Gerrard O'Callaghan and Graham Horn re: Trade description |
| {MTKC2/983} | 02/07/2012 | SKEL00171018 | E-mail from Graham Horn to Raj Shah FW: Cash Flows in Belgium |
| {MTKC/994} | 02/07/2012 | SKEL00171083 | E-mail from Raj Shah to Matthew Stein Re: Example trade description |
| {MTKC3/11} | 03/07/2012 | SKEL00098212 | E-mail from Graham Horn to Roger Lehman Re: Belgium |
| {MTKC3/11} | 08/07/2012 | SKEL00098212 | E-mail from Anupe Dwala to Ops@solo.com FW: Test Trades – NBAD and BBG |

| | Date | Reference | Description |
|---|---|---|---|
| {MTKC3/46} | 10/07/2012 | SKEL00171854 | E-mail from Stephen Everard to Raj Shah Re: Mark-Up |
| {MTKC3/141}<br>{MTKC3/30} | 27/07/2012 | SKEL00003795 | E-mail from Jessica Spoto to Stef Lambersy Re: Meeting |
| {MTKC3/196} | 08/08/2012 | SKEL00173907 | E-mail from Luigi Galluccio to Anoe Dwala Re: Urgent – Flex Future to be set-up |
| {MTKC3/266} | 14/08/2012 | SKEL00004866 | E-mail from Graham Horn to Rah Shah RE: Intraday stockborrow Orca Investments A/C ORC01 (Trade Request Authorisation) |
| {MTKC3/286} | 20/08/2012 | SKEL00174931 | E-mail from Stef Lambersy to Raj Shah RE: Acorn Capital Strategies, LLC Employee Pension Profit Sharing Plan & Trust - Danish reclaims |
| {MTKC3/296} | 21/08/2012 | SKEL00175026 | E-mail from Raj Shah to Stef Lambersy RE: Acorn Capital Strategies, LLC Employee Pension Profit Sharing Plan & Trust - Danish reclaims |
| {MTKC3/375} | 21/08/2012 | SKEL00175539 | E-mail from Gary Pitts to Graham Horn RE: Compliance Risk assessment – Custody business |
| {MTKC3/408} | 03/09/2012 | SKEL00956357 | E-mail from Graham Horn to Raj Shah RE: Market Information |
| {MTKC3/435} | 11/09/2012 | SKEL00176534 | E-mail from Anupe Dwala to Various RE: Today's Securities Services Call |
| {MTKC3/437} | 11/09/2012 | SKEL00176543 | E-mail from Sanjay Shah to Raj Graham and Graham Horn Fw: Belgian Claims |
| {MTKC3/508} | 21/09/2012 | SKEL00177815 | E-mail from Graham Horn to Bernard Minsky and Gary Pitts RE: Custody guarantees? |
| {MTKC3/552} | 30/09/2012 | SKEL00178811 | E-mail from Anupe Dwala to various RE: Solo LLP – updated authorised signatory details |
| {MTKC3/569} | 02/10/2012 | SKEL00178987 | E-mail from Graham Horn to Adam La Rosa RE: Raubritter Pension Plan |

5

| | Date | Reference | Description |
|---|---|---|---|
| {MTKC3/660} | 08/10/2012 | DWF007977 | E-mail from Graham Horn to Various RE: NEWEDGE |
| {MTKC3/683} | 09/10/2012 | SKEL00006342 | E-mail from Sanjay Shah to Various RE: NEWEDGE |
| {MTKC3/685} | 09/10/2012 | SKEL00180118 | E-mail from Graham Horn to Jas Bains FW: NEWEDGE |
| {MTKC3/868} | 22/10/2012 | SKEL0018149 | E-mail from Grham Horn to Various RE: |
| {MTKC3/854} | 22/10/2012 | SKEL00181768 | E-mail from Anupe Dwala to Jas Bains Re: August MI Pack |
| {MTKC4/79} | 05/11/2012 | SKEL00183795 | E-mail from Garry Pitts to various RE: Short selling - confirmation |
| {MTKC4/79} | 17/12/2012 | SKEL00183795 | E-mail from Raj Shah to Graham Horn Re: US Pension Fund |
| {MTKC5/135} | 29/01/2013 | SKEL00100152 | E-mail from Roger Leham to Raj Shah and Sanjay Shah Re: Market guide |
| {MTKC5/463} | 11/02/2013 | DWF012333 | E-mail from Graham Horn to Various RE: Opinion re TTCA / Client Money (GSS) |
| {MTKC5/770} | 26/02/2013 | DWF012816 | E-mail from Graham Horn to Gary Pitts RE: First draft re: our conversation on GSS |
| {MTKC5/984} | 06/03/2013 | SKEL00100968 | E-mail from Dipti Vyas to Graham Horn and Jessica Spoto RE: Novozymes DCAs |
| {MTKC5/984} | 08/03/2013 | SKEL00100968 | E-mail from Raj Shah to Graham Horn RE: |
| {MTKC1/890} | 13/03/2013 | SKEL00161679 | E-mail from Jas Bains to Various Re: Solo Client Custody Agreement with "Opt-Out Language") |
| {MTKC25/667} | 27/03/2013 | DWF016058 | Dividend Credit Advice |
| {MTKC7/270} | 10/04/2013 | DWF013572 | E-mail from Graham Horn to Anupe Dwala FW: Austrian stock trade / further recommendation |
| {MTKC7/351} | 12/04/2013 | SKEL00226121 | E-mail from Graham Horn to Various RE: Solo client money account at Northchannel Bank |

| | Date | Reference | Description |
|---|---|---|---|
| {MTKC7/436} | 15/04/2013 | DWF013635 | E-mail from Gary Pitts to Jessica Hammers and Carla Aylott FW: Bank Account |
| {MTKC7/776} | 24/04/2013 | SKEL00231774 | E-mail from Graham Horn to Jessica Spoto Re: DIVIDEND CREDIT ADVICE-TRYG 24.04.13.docx |
| {MTKC7/860} | 25/04/2013 | SKEL00102359 | E-mail from Graham Horn to Stef Lambersy RE: Longform reclaim sending to Denmark |
| {MTKC7/956} | 01/05/2013 | SKEL00233311 | E-mail from Jas Bains to Anupe Dwala and Graham Horn RE: North Channel Client Money Account |
| {MTKC8/277} | 22/05/2013 | SKEL01014920 | E-mail from Graham Horn to Stef Lambersy Re: a request for additional information from the Belgian tax authorities |
| {MTKC8/344} | 31/05/2013 | SKEL00240850 | E-mail from Anupe Dwala to Various RE: GSS Weekly Business Summary |
| {MTKC8/418} | 10/06/2013 | SKEL00244630 | E-mail from Gary Pitts to Anupe Dhorajiwala and David Deards RE: We can disclose the information to JPM |
| {MTKC26/268} | 01/07/2013 | SSHA00011667 | E-mail from Anne Becker –Christensen to Jessica Hammers RE: Request for Call |
| {MTKC9/792} | 29/09/2013 | DWF034496 | E-mail from Graham Horn to Imtiyaz Bhat RE: transaction details |
| | 12/11/2013 | {B/117.11/17} | E-mail from Graham Horn to Thomas Hornung RE: Example Flow |
| | 14/01/2014 | {B/117.11/28} | E-mail from Anupw Dwala to Thomas Hornung Re: Open queries and tomorrow's call |
| {MTKC10/651} | 21/01/214 | SSHA00012170 | E-mail from Mark Schofield to Sanjay Shah Re: Meeting |
| | 22/01/214 | {B/117.11/31} | E-mail from Graham Horn to Thomas Hornung Re: Open queries |

| | Date | Reference | Description |
|---|---|---|---|
| {CMTBB/648} | 27/01/2014 | SKSK00496677 | E-mail from Anupe Dwala to Thomas Hornung RE: Open queries – milestones |
| {MTKC11/12} | 19/02/2014 | INDIGO0022215 | Calendar invite from Nailesh Teraiya to Graham Horn RE: Nicola Green- Bovill |
| {MTKB1/359} | 21/02/2014 | GOAL_00002498 | Calendar Invite from Tania Dupoy to various RE: Witholding Tax Reclamation. |
| {MTKC11/179} | 25/02/2014 | SSHA00012094 | Anne Stratford markup of HS advice |
| {MTKC11/298} | 26/02/2014 | INDIGO0022376 | E-mail from Nicola Green to Graham RE: LIEN |
| {MTKC11/333} | 28/02/2014 | SKEL00363304 | E-mail rom Terry Hollingsworth to Sanjay Sah Re: Tax Discussion |
| {MTKB1/417} | 26/03/2014 | GOAL_00002982 | E-mail Exchange between Graham Horn and Charlotte Benge RE: Tax Matrix Information |
| {MTKB1/527} | 19/05/2014 | ACU00000873 | E-mail from Melania Zobbio to Don Donaldso RE Danish Reclaims – set-up documents confirmation of receipt |
| {CMTKBB/219} | 22/05/2014 | SKSK00236416 | E-mail from Matthew Stein to Raj Shah Re: |
| {CMTKBB/465} | 04/07/2014 | SKSK00263072- | E-mail from Graham Horn to Various RE: Brokerage Fees |
| {CMTKBB/268} | 09/07/2014 | SKSK00238464 | E-mail from Graham Horn to Adam Larosa RE: NCB And Indigo Trades |
| {CMTKBB/474} | 14/07/2014 | SKSK00263223 | E-mail from Raj Shah to Matthew Stein RE: Onboarding of Plans at Indigo ,, |
| {CMTKBB/480} | 28/07/2014 | SKSK00263508- | E-mail exchange between Graham Horn, Don Donaldson and Adam Larosa RE: Passive Growth Etc |
| {MTKC26/679} | 40/08/2014 | SKSK00477842 | Bech-Bruun Danish Opinion |
| {CMTKBB/276} | 06/08/2014 | SKSK00239245 | E-mail from Adam Larosa to Various FW: Unwind Schedule |

| | Date | Reference | Description |
|---|---|---|---|
| {CMTKBB/651} | 13/08/2014 | SKSK00497623 | E-mail from Rah Shah to Adam Larosa RE: Unwind schedule |
| {MTKB1/613} | 18/08/2014 | GOAL_00005635 | E-mail from Graham Horn to Daniel Barros RE: ORYX Payment Summary 150814 |
| (CMTKBB/166) | 14/10/2014 | SKSK00222423 | E-mail from Anupe Dwala to various RE: Frankfurt Visit |
| {MTKB1/680} | 23/10/2014 | DWF025613 | Siladen Limited Board Resolution |
| {MTKC16/608} | 12/11/2014 | INDIGO0037189 | E-mail from Graham Horn to Heena Shah and Natassia Kourousi RE: TODAY |
| {MTKB1/766} | 12/01/2015 | DWF016910 | E-mail from Graham Horn to Natassia Kourousi RE: GESL Business Plan V4 |
| {MTKB1/818} | 27/01/2015 | LINDIS000172 | E-mail from Graham Horn to Arthur Hogarth and Paul Baker Re: Gold Eagle contact details as of Monday 2nd February |
| {MTKB1/835} | 28/01/2015 | LINDIS000180 | E-mail from Graham Horn to Paul Baker Re: T&Cs wih take on clients and sub custodianship |
| {MTKB1/854} | 30/01/2015 | LINDIS000209 | E-mail from Gelara Avak to Arthur Hogarth and Paul Baker RE: Trade Date – Email Chain Examples |
| {MTKB1/871} | 02/02/2015 | LINDIS000233 | E-mail from Gelara Avak to Graham Horn Re: Custody TCs.doc |
| {MTKB1/888} | 04/02/2015 | LINDIS000263 | E-mail from Graham Horn to Paul Baker RE: Clarification of complete role |
| {MTKB1/902} | 05/02/2015 | LINDIS000285 | E-mail from Paul Baker to Graham Horn RE: Clarification of Complete Role |
| {MTKB2/113} | 11/02/2015 | DWF025612 | Siladen Limited Board Resolution |
| {MTKB3/144} | 22/04/2015 | DWF020895 | E-mail from Natassia Kourousi to GESL Team RE: |

|  | Date | Reference | Description |
|---|---|---|---|
| {MTKB3/709} | 26/05/2015 | DWF026124 | E-mail from Natassia Kourousi to GESL Team Re: GESL response |
| {MTKB3/706} | 27/05/2015 | DWF026116 | E-mail from Natassia Kourousi to Graham Horn RE: As Requested… |
| {MTKB3/741} | 05/06/2015 | DWF26165 | E-mail from Compliance Department to Harry Rowe RE: the re-draft |
| {MTKB3/842} | 15/06/2015 | DWF026234 | E-mail from Natassia Korousi to Harry Rowe Re: GH Comments to be discussed Tuesday |
| {MTKB3/928} | 09/07/2015 | DWF021537 | E-mail from Harry Rowe to Natassia Kourousi Re: Corporate actions – operational procedures document |
| {MTKB3/943} | 10/07/2015 | DWF021578 | Calendar Invite from Natassia Kourousi to Graham Horn re: Meeting with the FCA |
| {MTKB4/684} | 27/08/2015 | GOAL_00014435 | Email from Vicky Dean to Graham Horn Re: Hello! |
| {MTKB4/708} | 10/09/2015 | DWF026562 | E-mail from Graham Horn to Natassia Kourousi RE: thoughts… |
| {MTKB4/760} | 27/10/2015 | GOAL 00014796 | E-mail from Melissa-Anne Rodrigues to Graham Horn RE: Urgent - AJJ01/AQV01/CAM01/CAR01/ DEL01/DRO01/GBV01/KAR01/KBV01/WIN01 |